**Carl STERN**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Appellants.**

No. 83–1861.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 29, 1984.

Decided June 15, 1984.

Cornish F. Hitchcock, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellee.

Christine R. Whittaker, Attorney, Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), and Leonard Schaitman, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Before WALD, MIKVA and DAVIS*, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The Federal Bureau of Investigation (FBI) appeals from a district court order requiring disclosure of the names of three FBI employees investigated in connection with a possible cover-up of illegal FBI surveillance activities. No criminal charges were brought against these employees, but the FBI censured them for negligent job performance. The district court found that the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1982), requires the FBI to release the names and that none of the FOIA disclosure exemptions are applicable in this case. We reverse in part and affirm in part. We hold that the FBI may withhold the identities of two of the censured employees under Exemption 7(C) of the FOIA. We agree with the district court, however, that the public's interest in disclosure of the identity of the third employee—a high level official found to have participated knowingly in the cover-up—outweighs that employee's privacy interest under both Exemption 6 and Exemption 7(C) of the FOIA. We agree with the district court, therefore, that the FBI must disclose the name of that particular employee.

## I. BACKGROUND

This case arises from the discovery in the 1970's of the FBI's wide-spread illegal surveillance of political activists through the use of surreptitious entries and wiretappings. The Department of Justice (DOJ) conducted a full-scale investigation of the FBI's illegal activities, culminating in the April 1978 indictment of former high-level FBI officials L. Patrick Gray, III, W. Mark Felt, and Edward S. Miller. In the course of its investigation, the DOJ obtained information suggesting that the FBI, and perhaps one or more DOJ attorneys, failed to

disclose fully surreptitious entries in response to inquiries made by the General Accounting Office (GAO) in 1974, by several congressional committees in 1975, and by attorneys involved in a suit against numerous federal officials that was filed in 1973 by the Socialist Workers Party (SWP).

In response to this evidence, in April 1978, Attorney General Griffin B. Bell directed FBI Director William Webster to conduct an inquiry to determine whether FBI officials acted improperly in failing to discover and report all instances of surreptitious entry. *See* Office of the Attorney General, Press Release (April 10, 1978). The FBI investigation which followed was conducted by the FBI's Office of Professional Responsibility and led to a report to the Attorney General ("the FBI Report" or "the Report") that was released to the public in July 1980. *See* Report of FBI Director William H. Webster to Attorney General Benjamin Civiletti (February 19, 1980).

The Report set forth the "most probable causes for the FBI's failure to respond completely and accurately" to each of the various inquiries regarding FBI illegal surreptitious entries. It acknowledged that some FBI employees had intentionally withheld crucial information and that others contributed inadvertently to the cover-up through negligence and general bureaucratic bungling. No criminal indictments followed the FBI's investigation. The FBI employees found to be primarily responsible for the cover-up no longer worked for the FBI, and no action was taken against them. The FBI, however, censured for negligent job performance three employees who had contributed to the cover-up and who were still employed by the FBI. It is the release of the identities of these three employees that is at issue in this case.

The FBI Report supplied the general job title and detailed the involvement of each of the three censured FBI employees. According to the Report, two of those employ-

---

* Of the United States Court of Appeals for the Federal Circuit sitting by designation pursuant

to 28 U.S.C. § 291(a).

ees contributed inadvertently to the cover-up. One of those employees had been assigned to the FBI's Legal Counsel Division and was involved in the 1973 SWP litigation against the FBI. Over a three-year period during the course of that litigation, the government denied having conducted surreptitious entries against the SWP. This denial was based upon the FBI's repeated and erroneous assertions to the DOJ that no such entries had occurred. Eventually, the DOJ learned of the entries and corrected the government's denial. The FBI Report concluded that there was no "deliberate attempt on the part of any current employee to misrepresent ... the investigative techniques used in the SWP case." *Id.* at 16. An agent assigned to the Legal Counsel Division, however, was "censured for derelictions of his responsibilities." *Id.* at 17. In the censure letter to that employee, FBI Director Webster stated that, if the employee had reviewed pre-existing files more thoroughly, he might have discovered that the FBI's representations in the SWP litigation concerning surreptitious entries were false.

The second censured FBI employee found to have contributed inadvertently to the cover-up provided inaccurate and misleading information to the Senate Select Committee on Intelligence and the House Select Committee on Intelligence in 1975 regarding surreptitious entries conducted against the SWP and Weather Underground fugitives. This employee was responsible for handling the congressional requests for information. The FBI Report found that, while some experienced FBI agents (all retired) intentionally may have suppressed revelation of surreptitious entries, the censured employee's shortcoming was simply his lack of perseverance in gathering complete and accurate information. *Id.* at 23. In censuring this employee, Webster concluded that greater investigative initiative on the employee's part might have resulted in the discovery of illegal entries.

The FBI concluded that a third employee, a Special Agent in Charge (SAC) in the FBI's New York office, knowingly participated in a cover-up during a 1974 GAO audit of the FBI's domestic intelligence operations. This SAC followed specific directions from an Assistant Director to exclude from a particular teletype to FBI Headquarters any information concerning surreptitious entries carried out against the Weather Underground. The Report found that "there was an apparently deliberate attempt to withhold the existence of surreptitious entries from the GAO in this one instance." FBI Report at 6. Although the "individual most likely responsible for this misrepresentation retired in 1976," the FBI censured the SAC for his participation in that misrepresentation. *Id.* The SAC's censure letter was much more critical than the censure letters received by the other two employees. Webster concluded that the SAC "took part in an effort to withhold information from GAO" and that such action was "intolerable for a senior bureau official."

In sum, two contributors to the cover-up who were still FBI employees in 1980 were employees who, according to the Report, appeared to have acted inadvertently. The FBI Report presented no evidence that these employees violated any federal law, that they intended to cover up the illegal FBI activity, or that they were even aware of such attempts by others. The third employee, however, was found to have participated knowingly in the cover-up.

Several weeks after the Attorney General released the FBI Report, appellee Carl Stern, a television news reporter, requested that the FBI disclose the names of the three FBI employees whose censure was described by the Report. When the FBI refused, and all administrative appeals were exhausted, Mr. Stern filed suit in district court, seeking to have the information released under FOIA. Although the DOJ subsequently released to him copies of the letters of censure received by the three FBI employees, the employees' names and all other identifying material were redacted from the copies. Mr. Stern proceeded with his demand that the FBI release the FBI employees' names.

Both parties moved for summary judgment and, in June 1983, the district court granted summary judgment for the plaintiff, ordering disclosure of the names of the three censured FBI employees. In doing so, the court held that none of the FOIA disclosure exemptions apply in this case. The FBI and DOJ appealed.

## II. DISCUSSION

The central purpose of FOIA is to "open[ ] up the workings of government to public scrutiny" through the disclosure of government records. *McGehee v. CIA*, 697 F.2d 1095, 1108 (D.C.Cir.1983). Congress passed this legislation in the belief that "an informed electorate is vital to the proper operation of a democracy." *Id.* at 1108–09. *See FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982); *NLRB. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978). Yet Congress also realized that there are some government records for which public disclosure would be so intrusive—either to private parties or to certain important government functions—that FOIA disclosure would be inappropriate. This realization prompted Congress, both when FOIA was passed and in subsequent amendments, to engraft onto the statute a series of nine exemptions for cases in which disclosure would be inappropriate. 5 U.S.C. § 552(b). In this case we are concerned primarily with Exemption 7. 5 U.S.C. § 552(b)(7).

Exemption 7 protects from disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records" would cause one of six enumerated harms. *Id.* Our inquiry in this case is thus two-fold. First we must determine whether each requested document was an "investigatory record compiled for law enforcement purposes." If so, the FBI must then demonstrate that release of the material would cause one of the enumerated harms. *FBI v. Abramson*, 456 U.S. at 622, 102 S.Ct. at 2059. The harm with which we are concerned in this case is the "unwarranted invasion of personal privacy," set forth in Exemption 7(C).

### A. *Investigatory Records Compiled for Law Enforcement Purposes*

■ The censure letters satisfy the threshold test of Exemption 7 in that they are "investigatory records compiled for law enforcement purposes." This circuit has had several opportunities to determine when government records will be deemed to satisfy this test. The version of Exemption 7 that accompanied the original FOIA exempted "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." In reaction to broad judicial interpretations of that language, Congress amended the exemption in 1974 to enumerate specific categories of undesirable consequences that the exemption is intended to avoid. 2 O'Reilly, FEDERAL INFORMATION DISCLOSURE 17.04 (1982). Because the 1974 amendments did not substantially alter the threshold test under Exemption 7, we can avail ourselves of our pre-1974 cases to understand the scope of that test. *See Pratt*, 673 F.2d at 419 n. 27.

The threshold test entails two inquiries— whether the letters are "investigatory records" and whether they were compiled for "law enforcement purposes." The first inquiry is readily answered here. As the very outcome and conclusion of what was indisputably an investigation, the censure letters are "investigatory records." *See FBI v. Abramson*, 456 U.S. at 623, 102 S.Ct. at 2060; *see also Rural Housing Alliance v. U.S. Dept. of Agriculture*, 498 F.2d 73 (D.C.Cir.1974), *reh'g denied*, 502 F.2d 1179 (1974); *Stern v. SBA*, 516 F.Supp. 145 (D.D.C.1980).

■ As to the second inquiry, the government has the burden of showing that the records it seeks to shelter under Exemption 7 were compiled for adjudicative or enforcement purposes; the government, however, need not show that the investigation led to, or will lead to, adjudicative or enforcement proceedings. *Pratt v. Webster*, 673 F.2d 408, 421 (D.C.Cir.

1982); *Bast v. Dept. of Justice*, 665 F.2d 1251, 1254 (D.C.Cir.1981); *Rural Housing Alliance*, 498 F.2d at 80. In addition, the type of law enforcement to which Exemption 7 is addressed includes the enforcement of both civil and criminal federal laws. *Pratt*, 673 F.2d 408, 419, 420 & n. 32 (D.C.Cir.1982).

A review of the relevant case law indicates that there are two general categories of agency investigations that arguably fall within the scope of Exemption 7. The first category involves an agency's investigation of non-agency personnel and of activities external to the agency's own operations. The vast majority of investigations that have been found to be conducted for "law enforcement purposes" fall within this category of external investigations. Where an agency's principal function is criminal law enforcement, we have accorded deferential treatment to the agency's claims that its external investigation was for law enforcement purposes. *Pratt*, 673 F.2d at 418. Other circuits have adopted a similar stance. *See, e.g., Binion v. U.S. Dept. of Justice*, 695 F.2d 1189, 1193–94 (9th Cir. 1983).

The second general category of investigations involves internal investigations directed at the investigating agency's own activities and employees. This is the type of investigation at issue in the instant case. Internal agency investigations present special problems in the Exemption 7 context, for it is necessary to distinguish between those investigations conducted "for a law enforcement purpose," and those in which an agency, acting as the employer, simply supervises its own employees.

We have held that an agency's general internal monitoring of its own employees to insure compliance with the agency's statutory mandate and regulations is not protected from public scrutiny under Exemption 7, although another exemption, such as Exemption 6, may apply. *Rural Housing Alliance*, 498 F.2d at 81. This conclusion stems from a concern that protection of all such internal monitoring under Exemption 7 would devastate FOIA:

If this broad interpretation is accepted, however, we immediately encounter the problem that most information sought by the Government about its own operations is for the purpose ultimately of determining whether such operations comport with applicable law, and thus is "for law enforcement purposes." Any internal ... monitoring conceivably could result in disciplinary action, in dismissal, or indeed in criminal charges against the employees. But if this broad interpretation is correct, then the exemption swallows up the Act ... [and] defeats one central purpose of the Act to provide public access to information concerning the Government's own activities.

*Id.*

In *Rural Housing*, we developed the following test to distinguish between internal investigations conducted for law enforcement purposes and general agency internal monitoring that might reveal evidence that later could give rise to a law enforcement investigation: an agency's investigation of its own employees is for "law enforcement purposes" only if it focuses "directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Id.* This test is less deferential to the agency's own characterization of its investigation than the test we set forth in *Pratt* in the context of external investigations. *See Pratt*, 673 F.2d at 419.

We conclude that the *Rural Housing* test is met in this case. By focusing on specific and potentially unlawful activity by particular employees, the investigation went beyond general monitoring of agency activities. The DOJ had obtained sufficient information to warrant the initiation of the investigation. After the DOJ uncovered evidence that the FBI had failed to discover and report all incidences of surreptitious entries, the Attorney General directed the FBI to conduct an inquiry to determine the causes of the FBI's failure and to determine in what way FBI employees had contributed to this failure. The activity under investigation constituted potential viola-

tions of federal criminal laws prohibiting the obstruction of justice. *See* 18 U.S.C. § 1505 (obstruction of proceedings before departments, agencies, and committees); 18 U.S.C. § 1509 (obstruction of court orders); 18 U.S.C. § 1510 (obstruction of criminal investigations). The FBI has explicit statutory authority to investigate such violations of title 18 involving government employees, 28 U.S.C. § 535, and there is no question that title 18 criminal investigations conducted by the FBI are within the reach of Exemption 7(C). *See, e.g., Bast,* 665 F.2d at 1252–53 (Exemption 7(C) analysis applied to FOIA request concerning an FBI investigation of a federal judge accused of violating 18 U.S.C. § 1506 (obstructing justice by altering court records)).

The FBI inquiry in this case constituted an investigation of potentially criminal activity, and not general agency monitoring. Appellee argues, however, that, even if activity which constitutes potential violation of federal laws was the subject of inquiry, the investigation was not "for law enforcement purposes" because the FBI contemplated resort only to administrative disciplinary actions and not to criminal penalties. Appellee suggests that the FBI decided, prior to the investigation, that none of its employees had committed a federal crime, and, therefore, limited the inquiry from the start to the question of whether any employees should be disciplined for violating FBI personnel rules. The record does not support appellee's characterization of the investigation.

■ There can be no question that an investigation conducted by a federal agency for the purpose of determining whether to discipline employees for activity which does not constitute a violation of law is not for "law enforcement purposes" under Exemption 7. This is assumed in the *Rural Housing Alliance* test, which requires that the acts investigated must be ones "which could, if proved, result in civil or criminal sanctions." *Rural Housing Alliance,* 498 F.2d at 80. Furthermore, this is assumed in all of the FOIA cases respecting requests for the disciplinary records of federal employees which are analyzed under Exemption 6 (which protects certain personnel files), rather than Exemption 7. *See Dept. of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *see also Washington Post Co. v. U.S. Dept. of Health, Etc.,* 690 F.2d 252, 264 (D.C.Cir. 1982); *Chamberlain v. Kurtz,* 589 F.2d 827 (5th Cir.1979), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); 2 O'Reilly, FEDERAL INFORMATION DISCLOSURE 17.05 (1982).

Contrary to appellee's assertions, however, this is not the sort of "disciplinary" investigation presented here. The Attorney General directed the FBI to conduct an investigation to ascertain the causes of a possible cover-up of illegal activity by the FBI. The cover-up itself involved potential criminal activity. The DOJ mandate to the FBI nowhere suggested that the scope of the sanctions should be limited to administrative discipline. *See* Office of the Attorney General, Press Release (April 10, 1978). In addition, the investigation was conducted by the FBI's Office of Professional Responsibility, which has responsibility both for investigating all allegations of criminality on the part of FBI employees and for monitoring disciplinary action taken concerning FBI employees. *See* Appendix to FBI Report. The fact that the investigation did not end in prosecution does not remove it from Exemption 7 coverage. *Pratt,* 673 F.2d at 421. The only evidence appellee can point to that suggests that the investigation was not for law enforcement purposes was that the FBI referred to the investigation as an "internal disciplinary process" at various times in the course of this dispute. The label chosen by the FBI, however, cannot be determinative where the scope of the investigation was defined by the DOJ, not the FBI, and where presumably it is the DOJ's decision whether or not to bring criminal charges.

We conclude that, because the DOJ requested the FBI to conduct the in-house investigation of FBI employees to uncover evidence that could provide the DOJ with the grounds to bring criminal charges

against those employees, the FBI investigation was "for law enforcement purposes."

## B. *Unwarranted Invasion of Privacy*

■ Once we have determined that information satisfies the Exemption 7 threshold test, nondisclosure can be justified only if disclosure would cause one of the six harms enumerated within the statutory exemption. The FBI asserts that release of the names of the three employees would constitute an "unwarranted invasion of privacy," the harm protected against under subsection (C) of Exemption 7. Since the FBI already has released publicly the three censure letters, except for the employees' names and other identifying information, we face only the narrow question of whether disclosure of the identities of the censured employees would constitute an "unwarranted invasion of privacy." This necessitates a balancing between each censured employee's interest in privacy and the public's interest in disclosure. *Fund for Constitutional Government v. National Archives*, 656 F.2d 856, 862 (D.C.Cir. 1981); *Lesar v. U.S. Dept. of Justice*, 636 F.2d 472, 486 (D.C.Cir.1980). "Unlike exemption 6, which permits nondisclosure only when a document portends a '*clearly* unwarranted invasion of personal privacy,' exemption 7(C) does not require a balance tilted emphatically in favor of disclosure." *Bast*, 665 F.2d at 1254. We find that, while the question is close, disclosure of the names of the two lower-level employees would constitute an unwarranted invasion of their privacy within the meaning of Exemption 7(C). As to the third employee, the Special Agent in Charge, we conclude that Exemption 7(C) does not permit the FBI to withhold his name. Because Exemption 7(C) places a greater emphasis on protecting personal privacy than does Exemption 6, it is clear that Exemption 6 also is no bar to disclosure of the SAC's identity. *See Fund for Constitutional Government*, 656 F.2d at 862–63.

The Exemption 7(C) balancing test must be applied to the specific facts of each case. Because the myriad of considerations involved in the Exemption 7(C) balance defy rigid compartmentalization, per se rules of nondisclosure based upon the type of document requested, the type of individual involved, or the type of activity inquired into, are generally disfavored. *See, e.g., Bast*, 665 F.2d at 1254. A particular record may be protected in one set of circumstances, but not in others. Because the circumstances associated with the three censure letters are substantially similar, we begin by identifying the interests to be balanced in all three cases.

Our first task in the balancing process is the identification of the privacy interests at stake. In determining these interests, court decisions regarding FOIA Exemption 6—the exemption that protects "personnel . . . and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"—are directly relevant. Because Exemption 7(C) provides protection for a somewhat broader range of privacy interests than Exemption 6, *Fund for Constitutional Government*, 656 F.2d at 862–63, privacy interests cognizable under Exemption 6 are cognizable under Exemption 7(C). U.S. Department of Justice, Attorney General's Memorandum on the 1974 Amendments to the FOIA 9 (February 1975).

We begin with the recognition that an employee has at least a minimal privacy interest in his or her employment history and job performance evaluations. *See Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *Simpson v. Vance*, 648 F.2d 10, 14 (D.C.Cir.1980); *Sims v. CIA*, 642 F.2d 562, 575 (D.C.Cir.1980). That privacy interest arises in part from the presumed embarrassment or stigma wrought by negative disclosures. *See Simpson*, 648 F.2d at 14. But it also reflects the employee's more general interest in the nondisclosure of diverse bits and pieces of information, both positive and negative, that the government, acting as an employer, has obtained and kept in the employee's personnel file.

Second, and essential to our analysis here, individuals have a strong interest in

not being associated unwarrantedly with alleged criminal activity. Protection of this privacy interest is a primary purpose of Exemption 7(C). "[T]he 7(C) exemption recognizes the stigma potentially associated with law enforcement investigations and affords broader privacy rights to suspects, witnesses, and investigators." *Bast*, 665 F.2d at 1254. In our federal criminal justice system, the decision whether to prosecute an individual for a crime is entrusted to the prosecutor and is not subject to judicial review and rarely to public scrutiny. *Fund for Constitutional Government*, 656 F.2d 863–64. An ultimate decision not to prosecute does not always reflect the prosecutor's determination of the innocence of the accused. A FOIA disclosure that would "announce to the world that ... certain individuals were targets of an FBI investigation," albeit never prosecuted, may make those persons the subjects of rumor and innuendo, possibly resulting in serious damage to their reputations. *Id.* at 864. Such disclosure should be allowed only if the public interest in the information outweighs the significant privacy interests implicated.

The next step in the balancing process is to identify the public interest in disclosure. Here, the public interest in the disclosure of the identities of the censured employees is only in knowing *who* the public servants are that were involved in the governmental wrongdoing, in order to hold the governors accountable to the governed. *Baez v. Dept. of Justice*, 647 F.2d 1328, 1339 (D.C. Cir.1980); *see generally Washington Post Co.*, 690 F.2d at 264. This interest in knowing the identity of disciplined employees is distinguishable from other public interests that may arise in requests for disclosure of government investigatory records. For example, the public may have an interest in knowing that a government investigation itself is comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner. These other public interests do not enter into the determina-

tion of the case now before us, because they would not be satiated in any way by the release of the names of the censured employees.

Having identified the competing interests in this case, we must balance them. We begin with the two lower-level employees who were involved with the SWP litigation and with the congressional investigations into surreptitious entries conducted by the FBI against SWP and the Weather Underground fugitives.

### 1. *The Lower-Level Employees*

■ We agree with the district court that the status of the individuals in this case as federal employees diminishes their privacy interests in the censure letters because of the corresponding public interest in knowing how public employees are performing their jobs. *Bast*, 665 F.2d at 1254–55; *see Washington Post Co.*, 690 F.2d at 264; *Fund for Constitutional Government*, 656 F.2d at 865. Furthermore, we agree that the level of responsibility held by a federal employee, as well as the activity for which such an employee has been censured, are appropriate considerations for determining the extent of the public's interest in knowing the identity of that censured employee. *See Bast*, 665 F.2d at 1255. We conclude, however, that these and other factors tilt the balance *against* disclosure of the names of the two lower-level employees. Two factors in particular lead us to reverse the district court as to these employees.

First, the district court failed to give sufficient consideration to the FBI's conclusion that these two employees were not in any sense directly responsible for the cover-up, but rather were culpable only for inadvertence and negligence. The censure letters to these individuals indicate that their derelictions were acts of negligence—inadvertent failures to pursue leads and to become sufficiently familiar with pre-existing records. There was no element of intentional deception, or awareness of or acquiescence in, such deception. We must distinguish between the general import of

an event and the roles specific individuals play in that event. While we agree with the district court that the public has a strong interest in the airing of the FBI's unlawful and improper activities, we find that the public interest in knowing the identities of employees who became entwined inadvertently in such activities is not as great. The public interest in scrutinizing the import of the role these employees played in the cover-up is not directly furthered by a request for the release of the employees' names.

Second, the district court failed to consider one of the concerns underlying congressional enactment of Exemption 7(C): release of the employees' names could result in those employees being associated with notorious, and much more serious, allegations of criminal wrongdoing. The FBI inquiry that culminated in the censure letters grew directly out of a massive criminal investigation by the DOJ. The FBI investigation itself explored potentially criminal activity and was controversial in its own right. It also followed on the tail of, and was closely associated with, the highly publicized criminal indictment of top FBI officials. That disclosure of the employees' identities would result in their being associated with widely-publicized criminal investigations cuts on both sides of the balancing equation, see *Fund for Constitutional Government*, 656 F.2d at 865; *Congressional News Syndicate v. U.S. Dept. of Justice*, 438 F.Supp. 538, 543 (D.D.C. 1977) (invalidating the *per se* "aura of Watergate" argument), but not equally in this case. The FBI investigation became notorious because of the public interest in the allegations of serious governmental wrongdoing. But this does not reflect a heightened interest in the identity of employees who played only an inadvertent role in the cover-up. Instead, the risk that such employees could be linked to serious criminal wrongdoing when, in fact, they were totally cleared of any such acts, increases the potential invasion of privacy that Exemption 7(C) was designed to protect.

This case is a close one and our reversal of the district court as to these two employ-ees is based on the specific facts reflected in the record. We hold only that, where the release of the names of the two censured employees could cause them to become associated with notorious criminal investigations, where those employees were found to have contributed only inadvertently to the wrongdoing under investigation, and where the public interest in their identities is grounded only in a general notion of public servant accountability, the employees' privacy interest in nondisclosure is paramount and protects their identities from being revealed.

### 2. *The Special Agent in Charge*

We reach a different conclusion, however, as to the SAC who was involved with the GAO audit of the FBI's domestic intelligence operations. He was a higher-level official than the other two employees, and he participated *knowingly* in the cover-up. His censure letter stated:

> Although you were following instructions from a superior, you are culpable to the extent that you took part in an effort to withhold information from GAO. Your participation in acts that resulted in the FBI's not making a full and timely disclosure of surreptitious entries was a serious matter, and you should have been aware that the result of your action would be a misrepresentation to GAO.

The letter added that "this type of action is intolerable for a senior bureau official." This censure reflects the FBI's conclusion that, although the SAC did not initiate the plan to withhold relevant information available in the New York office, he was aware of the plan, acquiesced in it, and helped carry it out.

■ The balancing we are required to make under Exemption 7 tips toward disclosure in the SAC's case. We conclude that it would not be an "unwarranted invasion of personal privacy" to reveal his name, despite the potential association with notorious and serious allegations of criminal wrongdoing. He was a high-level employee who was found to have participated

**94**

deliberately and knowingly in the withholding of damaging information in an important inquiry—an act that he should have known would lead to a misrepresentation by the FBI. The public has a great interest in being enlightened about that type of malfeasance by this senior FBI official—an action called "intolerable" by the FBI—an interest that is not outweighed by his own interest in personal privacy. There is a decided difference between knowing participation by a high-level officer in such deception and the negligent performance of particular duties by the two other lower-level employees. The excuse that the SAC was merely following orders should not prevent the public from being informed that a specific "senior bureau official" followed a deliberately-chosen course when placed, perhaps, between a hard rock and his conscience. One basic general assumption of the FOIA is that, in many important public matters, it is for the public to know and then to judge.

### CONCLUSION

We hold that the FBI may withhold the names of the two lower-level employees, who were inadvertent participants in the cover-up, under Exemption 7(C) of the FOIA. We agree with the district court, however, that neither Exemption 7 nor Exemption 6 justifies nondisclosure of the name of the Special Agent in Charge who knowingly participated in an effort to withhold information from the GAO. We therefore reverse in part and affirm in part.

*It is so ordered.*