The NATION MAGAZINE, WASH-
INGTON BUREAU, and Max
Holland, Appellants,

v.

UNITED STATES CUSTOMS
SERVICE, Appellee.

No. 94–5275.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1995.

Decided Dec. 8, 1995.

Katherine A. Meyer, Washington, DC, argued the cause and filed the briefs for appellants.

Michael J. Ryan, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief. John D. Bates and Charles F. Flynn, Assistant United States Attorneys, Washington, DC, entered appearances.

Before: WALD, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellants The Nation Magazine and Max Holland, one of The Nation's contributing editors, ("The Nation") appeal a decision by the district court granting summary judgment to appellee the United States Customs Service ("Customs Service" or "Customs"). Asserting their right to obtain information from a government agency under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* (1994), appellants requested records regarding offers from billionaire and then-Presidential candidate H. Ross Perot to aid the Customs Service in its drug interdiction efforts. In its response letter, the Customs Service told appellants that it would neither confirm nor deny the existence of any records in its law enforcement investigatory files pursuant to FOIA's exception for law enforcement records set forth in 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)"), and that its search had otherwise revealed no responsive records. Appellants then filed suit in district court challenging Customs' determination as to the adequacy of the search and the applicability of Exemption 7(C). The district court granted summary judgment for Customs on both issues. *The Nation Magazine v. U.S. Customs Service,* No. 94–808, Memorandum Opinion (D.D.C. July 29, 1994) ("Mem.Op."). Appellants now ask us to reverse the district court's ruling.

We reverse the court's grant of summary judgment on both the adequacy of Customs' search and the applicability of Exemption 7(C). Regarding the adequacy of the agency's search, we find that Customs has not demonstrated beyond material doubt that its search was reasonably calculated to reveal responsive documents. It has not adequately explained what files other than Privacy Act records might contain information pertaining to the subject matter of appellants' request, nor has it provided details about the agency's "reading files" sufficient to support its claim that a search of those files for the 1981 "Chadwick memo" would be too laborious. As to Customs' assertion that Exemption 7(C) permits it to categorically refuse to confirm or deny the existence of any responsive records pertaining to third parties in its investigative files, we find this response cannot be categorically issued under Exemption 7(C) in all situations where a third-party FOIA requester seeks information from Customs' law enforcement files naming another indi-

vidual, if the requester credibly demonstrates that the records sought may shed light on agency conduct in which the requester is interested. Instead, on remand the district court must perform an ad hoc balancing of the privacy and public interests implicated by disclosure of any responsive material.

## I. BACKGROUND

On November 14, 1992, appellants submitted a FOIA request seeking access to "U.S. Customs Service records and documents indexed or cross-indexed under the name H. Ross Perot that were created any time between January 1969 and November 1992." They explained that the request included "all records and documents pertaining to Mr. Perot maintained for or by the Washington, DC headquarters of the Customs Service; and ... the Miami, Florida, and Houston, Texas offices," as well as information "pertaining to any person identified during the years 1969 to 1992 as an employee, consultant, or advisor to Mr. Perot." Appellants also noted that they were "especially interested in documents and records that pertain to offers by Mr. Perot to assist the Customs Service in the interdiction of illegal drugs." [1]

The Customs Service issued appellants a "Glomar response," [2] refusing to confirm or deny the existence of any such records. It asserted that because "disclosure of the mere fact that an individual is mentioned in an agency's law enforcement files carries a stigmatizing connotation," it could withhold any responsive records under Exemption 7(C). The Nation appealed this determination to the Director of Customs' Office of Regulations and Rulings, who affirmed the response. In its response, the agency stated that "the information sought, if it exists, is in a law enforcement system of records," and concluded that because disclosure of the existence of any records would be stigmatizing, "[p]roduction ... would be an unwarranted invasion of the personal privacy of the individual and exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(C)." Customs also told Holland that it had searched "non-investigatory files relating to Mr. Perot" in its Houston and Miami offices, as well as making a search of the system which logs correspondence of the Customs Commissioner, but had not located any responsive records in those files.

The Nation challenged this decision in district court, claiming that Customs' "refus[al]

---

**1.** At the time appellants filed their request, Perot had just completed an unsuccessful run for President as a major independent candidate, winning 19% of the national vote. During the course of his candidacy, the media reported several statements by Perot and his advisors regarding Perot's efforts to provide the federal government with private assistance in stopping the importation of illegal drugs. Most relevant to this case was an article dated May 30, 1992, in which a former Customs official named Frank Chadwick discussed several of these alleged proposals. Michael Isikoff, *Perot Proposed Buying Island for Drug Stings*, WASH.POST, May 30, 1992, at A1, A10. It described one plan, outlined in a 1981 memorandum from Chadwick to senior Customs officials ("Chadwick memo"), that called for Perot to establish "an aircraft refueling station, to be operated by Perot-financed commandos doubling as undercover informants for the Customs Service." According to Chadwick, Customs officials rejected the plan. The article also reported that Perot hired a former Green Beret named Richard Meadows to assist Customs, and that while in Perot's employ, Meadows conducted a two-week trip with a Customs informant to collect intelligence on drug smuggling operations. In addition, the article described two other schemes

proposed by Perot for cooperation with Customs: Perot reportedly advanced funds to recover a drug plane seized from a Customs informant, and wrote to former Customs commissioner William von Raab suggesting that the government permit private shipowners to arrest suspected drug smugglers on the high seas. A subsequent article reported that Perot acknowledged making some efforts to aid Customs that were of a more limited nature than those recounted by Chadwick. Frank Snepp, *Ross Perot's Private War on Drugs*, VILLAGE VOICE, June 9, 1992, at 28 (*reprinted in* Joint Appendix at 73–76). Based on these reports, as well as others recounted in various articles appended to appellants' summary judgment motion, appellants believed that the Customs Service might have records or information relating to these activities.

**2.** A response to a FOIA request, in which an agency states that it can "neither confirm nor deny" the existence of responsive records, is popularly referred to as a "Glomar response," after a case concerning a FOIA request for records relating to an underwater sea craft called the "Glomar Explorer." *See Phillippi v. CIA*, 546 F.2d 1009 (D.C.Cir.1976).

to process plaintiffs' FOIA request"[3] and make requested records available was unlawful. Complaint, *The Nation Magazine v. United States Customs Service*, No. 92–808 (D.D.C. July 29, 1994). Both appellants and the Customs Service then cross-filed for summary judgment. In their motion, appellants contested the adequacy of the search and the lawfulness of the "Glomar response" issued by the agency. In explaining its position, Customs reiterated the grounds it had provided in its letter to The Nation: if they existed, the records sought would most likely be in investigatory files; the agency had a policy of not confirming or denying the existence of such records; and no other relevant records had been located in the search of non-investigatory files in the Houston or Miami offices.

The district court granted Customs' motion for summary judgment and denied appellants' motion. It ruled that the agency had made an adequate search for the requested information, finding that the affidavits submitted by Customs sufficiently explained why the search was reasonably calculated to succeed. Mem.Op. at 13–14. The court also upheld Customs' refusal to confirm or deny the existence of responsive records in its investigatory files, finding that appellants had waived their right to this information by stating that they believed it unlikely the agency would locate responsive information in these files. *Id.* at 6–7. In addition, the court determined that even if responsive records indexed under Perot's name had been located in the investigatory files, the agency could withhold them under Exemption 7(C) on the grounds that they related to the actions of a private citizen, not the government, and thus fell outside the scope of FOIA. *Id.* at 7–8.

Appellants raise two issues on appeal. First, they challenge the district court's rul-ing on the adequacy of the search, arguing that the district court erred in allowing Customs to limit its search to Privacy Act records and to exclude "reading files" from the search. Second, appellants contend that the court erred in allowing Customs to categorically refuse to confirm or deny the existence of responsive records in the enforcement files on the basis of Exemption 7(C). They argue that in light of the agency's repeated identification of the investigatory files as the likely source of responsive records, the court cannot preclude disclosure based on appellants' original skepticism about the adequacy of this search. Appellants also take issue with the district court's determination that because any responsive information in the investigatory files would relate to the activities of a private citizen, rather than to agency conduct, it would be exempt anyway under Exemption 7(C).

## II. ADEQUACY OF CUSTOMS' SEARCH FOR RESPONSIVE RECORDS

■ Appellants first argue that the district court erred in granting summary judgment for the government on the question of whether Customs' search for responsive records was adequate. We review *de novo* a district court's grant of summary judgment in favor of an agency which claims to have complied with FOIA. *Steinberg v. United States Dep't of Justice*, 23 F.3d 548, 551 (D.C.Cir.1994) (citing *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C.Cir.1984) (*Weisberg III* )).

### A. Scope of Appellants' Request

■ To assess the adequacy of Customs' search, we must first ascertain the scope of the request itself. Customs limited its search to "Privacy Act systems of records," which include all records accessible by a name or personal identifier.[4] Supplemental

---

3. We interpret this claim in the manner articulated by appellants in their motion for summary judgment, as an allegation that Customs refused to confirm or deny the existence of responsive records in their investigatory files, and did not perform an adequate search of other files. Clearly Customs did not simply refuse to take any action on the request.

4. The Privacy Act requires that all agency records retrievable by an individual's name or personal identifier be maintained in a "Privacy Act System of Records." 5 U.S.C. § 552(a). Of the 113 systems listed as Privacy Act records, Customs examined its investigatory files (TECS), its systems indexing correspondence of the Commissioner (Data Point system and Executive Secretary), and files in its Houston and Miami regional

Decl. of Kathryn C. Peterson at 2. The agency argued that this search was adequate because appellants only asked for records "indexed and cross-indexed" to Perot's name. Appellants disagreed with this characterization of their request, arguing that it extended to documents which we will call "subject matter files" for the sake of convenience—those documents which contain information relevant to Perot's offers of assistance, but are not filed under Perot's name. They claimed that since a search of Privacy Act records would not necessarily turn up such files, Customs' efforts were inadequate.

■ Although a requester must "reasonably describe[ ]" the records sought, 5 U.S.C. § 552(a)(3), an agency also has a duty to construe a FOIA request liberally. *Truitt v. United States Dep't of State*, 897 F.2d 540, 544–45 (D.C.Cir.1990) (citing Senate Report accompanying relevant provision of FOIA); *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836–37 (D.C.Cir.1979) (same). Appellants' request does ask for records indexed under Perot's name, but it also explicitly seeks information "pertaining to" Perot and information regarding offers by Perot to assist Customs in drug interdiction efforts. The one document that appellants did identify with specificity, the Chadwick memo, does not mention Perot's name. Isikoff, *Perot Proposed Buying Island for Drug Stings*, at A10. The words "pertaining to," coupled with the inclusion of references to the Chadwick memo in the materials appended to the request letter, were sufficient to alert the agency that appellants sought information about Perot, even if it was not indexed under his name. Accordingly, appellants' request should be interpreted to include subject matter files on topics of interest to appellants (for example, a file labeled "assistance provided by private citizens in drug interdiction efforts" would be relevant), in addition to files indexed under Perot's name or personal identifier.

offices. Supplemental Decl. of Kathryn C. Peterson at 2–3. It did not search for files on "internal affairs concerning investigations of Customs personnel, regulatory audit information, Customs

### B. *Adequacy of Customs' Search*

■ To win summary judgment on the adequacy of a search, the agency must demonstrate beyond material doubt that its search was " 'reasonably calculated to uncover all relevant documents.' " *Truitt*, 897 F.2d at 542 (quoting *Weisberg v. United States Dep't of Justice*, 705 F.2d 1344, 1351 (D.C.Cir.1983) (*Weisberg II* )). The agency must make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 68 (D.C.Cir.1990) (citing *Weisberg III*, 745 F.2d at 1485; *Weisberg II*, 705 F.2d at 1351), and it "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Id.* To show reasonableness at the summary judgment phase, an agency must set forth sufficient information in its affidavits for a court to determine if the search was adequate. *Id.* The affidavits must be "reasonably detailed ..., setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* Conclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment. *Weisberg v. United States Dep't of Justice*, 627 F.2d 365, 370 (D.C.Cir.1980) (*Weisberg I* ) (affidavit asserting that agency official "ha[s] conducted a review of [agency] files which would contain [responsive] information," without describing approach to search or identifying files searched, is insufficiently detailed to permit summary judgment).

■ Turning to the affidavits proffered by the agency in this case, it is helpful to review Customs' description of its recordkeeping system and the breadth of its search. The agency maintains "more than 113 systems of records" that are "accessible by a name or personal identifier." Supplemental Decl. of Kathryn C. Peterson at 2. It does not have

personnel information, Customs rulings or information which would be maintained in any Customs Headquarters offices." *Id.* at 3–4.

a central index of all records, but instead maintains two electronic records systems: a system of investigatory files (the Treasury Enforcement Communications System, or "TECS"), which contains data on violators and possible violators of laws enforced by Customs, and the Automated Commercial System, a database of information regarding merchandise imported into the United States, which is not relevant to this case. It also maintains the "Executive Secretary Correspondence System," which indexes correspondence for the Customs Commissioner, as well as an old file of the Commissioner's correspondence called the "Data Point System." *Id.* at 3. Additionally, at its headquarters, Customs keeps "reading files," which hold copies of letters, memoranda, and correspondence. These records are filed chronologically, but not indexed by category, subject, or other topical identifier. *Id.* at 2. Regional Customs offices maintain their own files, some of which are discarded after three years.

Of these systems, Customs searched its TECS files, but declined to confirm or deny whether this search disclosed any responsive records. It also searched the Executive Secretary Correspondence and Data Point Systems, but these files did not yield responsive information. *Id.* at 3. Additionally, the agency examined indexes in its Houston and Miami regional offices. In Houston, Customs examined "reader files," which apparently contain "agency correspondence." Decl. of Kathryn C. Peterson at 7. These files, which are discarded by the Houston office after three years, did not hold any responsive information for the years of interest to appellants—1969 to 1992. The agency also checked an "old 'card file' index system" in use by the Houston office prior to TECS, but this did not reveal responsive records. *Id.* In the Miami office, Customs conducted "a search for records reflecting any reference to H. Ross Perot, an island, a Caribbean Island or Customs usage of such either singularly or in any combination," but failed to locate responsive information. *Id.* at 7–8. Customs declined to search its "reading files," claiming that such a search would be too laborious.

In assessing the reasonableness of this search, there are two issues that concern us. First, has Customs made an adequate search of files other than its reading files? Second, has Customs presented an adequate justification for not searching the reading files which it maintains in its headquarters? As to the first question, Customs asserted in its affidavits that it "made a comprehensive search through all of its records systems where [records] responsive to the Plaintiffs request could conceivable [sic] be maintained and failed to locate any [responsive] records ... with the exception of the finding(s) set forth in the Defendant's *In Camera* Declaration." Second Supplemental Decl. of Kathryn C. Peterson at 4. If we agreed with the agency's position that appellants sought only those records indexed under Perot's name, we might find this search adequate. But as explained in Part II.A. above, we have construed the scope of appellants' request more broadly than did Customs, to include "subject matter files." Customs did not describe its recordkeeping system in sufficient detail to permit us to identify what subject matter files, other than those in the Privacy Act System of Records, might hold responsive information regarding Perot's offers to help Customs with its drug interdiction efforts. In the absence of this information, the agency's assertions are too conclusory to allow *de novo* review of the adequacy of its search.

■ As to the second question, Customs claims a search of its reading files would be unreasonably burdensome. To be sure, there are some limits on what an agency must do to satisfy its FOIA obligations. For example, a request to inspect "every chronological office file and correspondent file, internal and external, for every branch office, staff office [etc.]" of the Census Bureau in hopes of discovering information regarding the Bureau's promotion practices was held to be unreasonable, as was a request to inspect "every division or staff administrative office file in the Bureau which records, catalogues, or stores [promotion forms or memos]." *American Fed'n of Gov't Employees, Local 2782 v. United States Dep't of Commerce*, 907

F.2d 203, 208–09 (D.C.Cir.1990).[5] Here, appellants have asked Customs to search through 23 years of unindexed files for records pertaining to Perot, and we concur with the district court's determination that this search would impose an unreasonable burden on the agency.[6] We are puzzled, though, by the district court's determination that searching for the 1981 Chadwick memo would be too laborious, given that the files are indexed chronologically.[7] On remand, the district court should order Customs to search its reading files for this document if it cannot provide sufficient explanation as to why such a search would be unreasonably burdensome.

Because Customs has not submitted sufficiently detailed affidavits to allow us to review the adequacy of their search, we reverse the district court's grant of summary judgment on this point. On remand, the district court should address both issues that occasion our reversal here: whether the search of files other than the reading files was sufficient; and why a search of its reading files for the 1981 Chadwick memo would have been unreasonably burdensome. The court should order Customs to provide additional information on the question of whether it maintains topical or subject matter files, and if so, whether these files are likely to contain records responsive to appellants' request. It should also order Customs to submit further affidavits explaining why a search of the reading files for the Chadwick memo would be too laborious.

### III. APPLICABILITY OF EXEMPTION 7(C)

Customs relied on Exemption 7(C) of FOIA to justify its refusal to confirm or deny the existence of any responsive records in its TECS investigatory files. Letter of Mar. 30, 1994, *reprinted in* Joint Appendix at 89. The district court affirmed this response, ruling that appellants were not permitted to obtain any information that might be found in the investigatory files because they initially had expressed doubts as to whether those files contained responsive records. Mem.Op. at 6–7. The court also determined that the records sought, if they existed, would pertain to the activities of a private citizen rather than to agency conduct, and thus were not covered by FOIA. *Id.* at 7–8. We will sustain the district court's grant of summary judgment for the agency on this issue only if we find that the agency has met its burden of demonstrating that the requested records are exempt from disclosure. *United States Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 546, 116 L.Ed.2d 526 (1991); *see also* 5 U.S.C. § 552(a)(4)(B).

As an initial matter, we can dispense with the district court's ruling that appellants' skepticism about whether the TECS files were a likely source of information indicated that they were engaged in a "fishing expedition" and abrogated their right to any responsive records that might be found in those files. Mem.Op. at 7. If appellants had first identified the investigatory files as a target of their FOIA request, but then proclaimed doubts as to whether the files contained relevant information, the district court's decision to withhold information might strike us as more reasonable. But here, Customs repeatedly identified the TECS files and the index of the Commissioner's correspondence as the systems "which logically would maintain records responsive to the Plaintiff's request." Supplemental

---

5. Customs cites two other cases in support of their argument that a search of reading files would be unduly burdensome, *Dunaway v. Webster*, 519 F.Supp. 1059, 1083 (N.D.Cal.1981), and *Posner v. United States Dep't of Justice*, 2 GDS ¶ 82,229 at 82,650 (D.D.C.1982). These cases, however, hold only that an agency is not required to produce entire documents that only incidentally mention the subject of the request, not that a page-by-page search of reading files is necessarily too laborious.

6. Customs also explained its refusal to search these files as justified by the scope of appellants' request; because appellants had requested files

"indexed or cross indexed" by Perot's name, and the reading files are not so indexed, the agency was not obligated to search these files. Again, this justification is inapposite given our determination that appellants' request included subject matter files, not just those indexed under Perot's name.

7. Of course, the failure to turn up this document does not alone render the search inadequate; there is no requirement that an agency produce *all* responsive documents. *Perry v. Block*, 684 F.2d 121, 128 (D.C.Cir.1982).

Decl. of Kathryn C. Peterson at 4; *see also* Second Supplemental Decl. of Kathryn C. Peterson at 4. Appellants challenged this assertion not in bad faith, but in the context of contesting the adequacy of Customs' search. Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment, No. 94–808 at 3, 14–15, *reprinted in* Joint Appendix at 174, 185–86. To deny appellants access to any information that the TECS files might contain on the basis of these doubts would make sense only if their statements could reasonably be read as a withdrawal of their request insofar as the TECS files were pertinent, a standard not here satisfied.

 The district court's affirmance of Customs' reliance on Exemption 7(C) to justify its "Glomar response" presents a more difficult legal question. Customs seeks affirmance of a policy to neither confirm nor deny the existence of "investigative information pertaining to third parties ... whether the individual be a suspect or a witness." Decl. of Kathryn C. Peterson at 6. We understand this policy to be a categorical rule that Customs will refuse to confirm or deny the existence of any information in its law enforcement records which mentions an individual by name. Because we find that in these circumstances a categorical rule authorizing issuance of a Glomar response is inappropriate, we reverse the district court's grant of summary judgment on this issue and direct the court on remand to perform the ad hoc balancing of private and public interests generally required under Exemption 7(C).

 As the Customs Service noted, rules exempting certain categories of records from disclosure are sometimes permitted, even encouraged, as a workable manner of meeting FOIA obligations. *See, e.g., United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 779, 109 S.Ct. 1468, 1485, 103 L.Ed.2d 774 (1989) (quoting *FTC v. Grolier, Inc.,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983)); *Critical Mass Energy Project v. NRC,* 975 F.2d 871, 879 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1992). There are limits, though, to when categorical rules may be employed. Only when the range of circumstances included in the category "characteristically support[s] an inference" that the statutory requirements for exemption are satisfied is such a rule appropriate. *See United States v. Landano,* 508 U.S. 165, —— ——, 113 S.Ct. 2014, 2022–23, 124 L.Ed.2d 84 (1993) (rejecting categorical rule for applying Exemption 7(D), which applies to confidential sources).

 Exemption 7(C) allows an agency to withhold "investigatory records compiled for law enforcement purposes, or information which if written would be contained in such records, but only to the extent that the production of such records or information would ... constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The courts have construed this provision as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure. *Reporters Committee,* 489 U.S. at 776, 109 S.Ct. at 1483; *Davis v. United States Dep't of Justice,* 968 F.2d 1276, 1281 (D.C.Cir.1992). Under the exemption, a Glomar response may be issued in place of a statement acknowledging the existence of responsive records but withholding them, if confirming or denying the existence of the records would associate the individual named in the request with criminal activity. *See, e.g., Reporters Committee,* 489 U.S. at 757, 109 S.Ct. at 1473 (refusal to confirm or deny whether FBI had rap sheets on named individual); *Beck v. United States Dep't of Justice,* 997 F.2d 1489, 1491–92 (D.C.Cir.1993) (refusal to confirm or deny whether Department of Justice Office of Professional Responsibility had records of complaints against named agent); *Dunkelberger v. United States Dep't of Justice,* 906 F.2d 779, 780 (D.C.Cir.1990) (refusal to confirm or deny whether FBI has records on administrative disciplinary action against named agent).

 To assess the district court's categorical balancing of private and public interests with respect to Customs' contested Glomar policy, we must compare the two interests to determine if "the balance characteristically tips in one direction." *Reporters Committee,* 489 U.S. at 776, 109 S.Ct. at

1483. As is often the case with judicial balancing tests, the manner in which we define the interests on both sides of the scale has a substantial effect on the outcome of our decision. First, we examine the privacy interests implicated by disclosure to third parties of material contained in investigatory files. In a number of cases, this court has found that individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation. *See, e.g., Dunkelberger*, 906 F.2d at 781 (citing *Stern v. FBI*, 737 F.2d 84 (D.C.Cir.1984)); *Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 864 (D.C.Cir. 1981). That privacy interest also extends to third parties who may be mentioned in investigatory files, as well as to witnesses and informants who provided information during the course of an investigation. *See Davis*, 968 F.2d at 1281 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C.Cir.1990)); *King v. Dep't of Justice*, 830 F.2d 210, 233 (D.C.Cir. 1987). Thus, a substantial privacy interest arises in the circumstances which fall within Customs' categorical rule. This holds true for disclosure of any records that may exist in this case, as well. Perot has some interest in nondisclosure [8] of any records regarding his offers of assistance, even if they refer to him as an individual who has offered to help the agency in performing its law enforcement duties, rather than as a potential violator of Customs laws.[9] Because the magnitude of Perot's privacy interest turns on whether disclosure might result in unwarranted association with criminal activity or reputational harm, records discussing offers of assistance may implicate a less substantial privacy interest than any records associating Perot with criminal activity.

■■■ Second, we must evaluate the public interest. This interest must be assessed in light of FOIA's central purpose, which is "to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976). In *Reporters Committee*, the Supreme Court elaborated on the type of interest relevant to an Exemption 7(C) balancing by stating that "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." 489 U.S. at 773, 109 S.Ct. at 1481; *accord Beck*, 997 F.2d at 1492–94; *Davis*, 968 F.2d at 1282; *Dunkelberger*, 906 F.2d at 781. Although *Reporters Committee* and the precedent of this circuit make clear that FOIA extends only to those records which reveal something about *agency action*, the mere fact that records pertain to an individual's activities does not necessarily qualify them

---

8. The district court upheld Customs' decision to issue a Glomar response rather than to acknowledge the existence of responsive records but withhold them. As we noted above, a Glomar response is appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect; that is, whether an individual has been the target of a law enforcement investigation. We are not clear why the district court believed this response warranted here. Unlike other cases where we have approved a Glomar response, there is the possibility that responsive records, if any exist, would refer to Perot as offering to *help* Customs in its law enforcement duties, rather than tarring him with the brush of *criminal* activity. Additionally, if Perot waived his right to § 7(C) protection of his identity in the first instance by publicly claiming to have done the very things that documents responsive to the request discuss, *see infra* at 896, it would follow that unless some other exemption were applicable, he had also waived his right to a Glomar response, which is simply a way of preventing disclosure of information substantively protected by one of the FOIA exceptions. *See Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C.Cir.1982) ("We have ... agreed that an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a FOIA exception."). Regardless, we concur with the district court that Perot does have a cognizable privacy interest in nondisclosure of any information mentioning him which might be contained in law enforcement files.

9. This is so despite Perot's national prominence and former status as a presidential candidate. Although candidacy for federal office may diminish an individual's right to privacy; *Common Cause v. National Archives & Records Serv.*, 628 F.2d 179, 184 (D.C.Cir.1980), it does not eliminate it, *Fund for Constitutional Gov't*, 656 F.2d at 865.

for exemption. Such records may still be cloaked with the public interest if the information would shed light on agency action.

It is in applying this standard to the circumstances of this case that the district court erred. Based on its determination that appellants' request related only to the activities of a private citizen, not to agency conduct, the district court concluded that appellants' request triggered only a minimal public interest in disclosure. Mem.Op. at 8. As the language of the contested request indicates, it would be disingenuous to suggest that appellants are not interested in the actions of Perot. Unlike the private activities in *Reporters Committee* and the cases cited from our own circuit, however, what makes Perot's activities significant is their connection to agency conduct. Appellants want to find out whether Perot offered to help a federal agency fulfill its statutory duties to interdict drugs, and if so, how that agency responded to his overtures. Although Perot himself may be a target of their investigative work, appellants also expressed interest in the "privatization of government functions," particularly operations which are covertly funded. The district court acknowledged as much, in stating that appellants sought to determine whether "Customs planned to privatize certain components of the nation's drug interdiction efforts." *Id.* at 6–7. These concerns are about "agency activity," not just Perot's private activities. As such, their disclosure may serve the public's interest in knowing "what their government is up to." *Reporters Committee*, 489 U.S. at 773, 109 S.Ct. at 1481.

Our characterization of the public interest at stake in this case also informs our appraisal of whether a categorical Glomar response is appropriate. In some, perhaps many, instances where a third party asks if an agency has information regarding a named individual in its law enforcement files, the cognizable public interest in that information will be negligible; the requester will be seeking records about a private citizen, not agency conduct. *See, e.g., Reporters Committee*, 489 U.S. at 773–75, 109 S.Ct. at 1481–83; *Beck*, 997 F.2d at 1493–94; *Davis*, 968 F.2d at 1282; *Dunkelberger*, 906 F.2d at 781. In this case, however, appellants have identified a public interest cognizable under FOIA in disclosure of any information regarding Perot's offers of assistance that might exist in Customs' investigatory files. Because the range of circumstances included in Customs' categorical rule do not "characteristically support" an inference that all material in law enforcement files which names a particular individual is exempt from disclosure to third parties, a more particularized approach is required. *Cf. Landano*, 508 U.S. at ——– ——, 113 S.Ct. at 2021–24. On remand, we direct the district court to engage in ad hoc balancing of the competing interests at stake here, taking into consideration our assessment of the cognizable public interest in disclosure of responsive records. Of course, Customs is also free to articulate a revised categorical rule regarding disclosure of law enforcement records if it can identify more narrowly tailored circumstances under which the balance of privacy and public interest characteristically tips in the direction of exemption.

Finally, we must address the district court's determination that our decision in *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C.Cir.1991), authorizes Customs' policy of categorically issuing a Glomar response to any requester seeking investigatory information that pertains to a third party. The district court cited *SafeCard* in support of its ruling that FOIA requesters "are not otherwise entitled to information about a private citizen that is housed in an agency's investigatory files." Mem.Op. at 8. As we have explained above, we construe the appellants' FOIA request more expansively than did the district court, to include any information pertaining to Perot's offers of assistance. Although the district court might not have found *SafeCard* applicable had it interpreted appellants' request in a similar manner, *see* Mem.Op. at 8 n. 1 ("If the Plaintiffs had sought to use investigatory information about Perot to shed light on, for example, Customs' investigatory practices, their search would clearly have fallen within the scope of FOIA."), the district court's discussion of the scope of *SafeCard* is sufficiently problematic to cause us to briefly clarify that precedent prior to remanding the case.

*SafeCard* permits an agency to withhold "the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) [unless disclosure] is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity." *Id.* at 1206. It is one in a long line of FOIA cases holding that disclosure of the *identities* of private citizens mentioned in law enforcement files constitutes an unwarranted invasion of privacy and is thus exempt under 7(C). *See, e.g., McCutchen v. United States Dep't of Health & Human Servs.,* 30 F.3d 183, 187–90 (D.C.Cir.1994); *Keys v. United States Dep't of Justice,* 830 F.2d 337, 346–48 (D.C.Cir.1987); *King,* 830 F.2d at 232–35; *Senate of Puerto Rico v. Dep't of Justice,* 823 F.2d 574, 587–88 (D.C.Cir.1987); *Fund for Constitutional Gov't,* 656 F.2d at 863–66; *Baez v. United States Dep't of Justice,* 647 F.2d 1328, 1338–39 (D.C.Cir.1980); *Lesar v. Dep't of Justice,* 636 F.2d 472, 486–88 (D.C.Cir.1980); *see also Rose,* 425 U.S. 352, 96 S.Ct. 1592. In *SafeCard,* the court relied on those cases to formulate a categorical rule denying disclosure of such information unless the requester can show that the records would confirm or refute allegations of illegal agency activity.

We agree with the agency and the district court that, to the extent any information contained in 7(C) investigatory files would reveal the identities of individuals who are subjects, witnesses, or informants in law enforcement investigations, those portions of responsive records are categorically exempt from disclosure under *SafeCard.* But we do not read *SafeCard* as permitting an agency to exempt from disclosure *all* of the material in an investigatory record solely on the grounds that the record includes some information which identifies a private citizen or provides that person's name and address. Because such a blanket exemption would reach far more broadly than is necessary to protect the identities of individuals mentioned in law enforcement files, it would be contrary to FOIA's overall purpose of disclo-

sure, and thus is not a permissible reading of Exemption 7(C).

As a general rule, *SafeCard* directs an agency to redact the names, addresses, or other identifiers of individuals mentioned in investigatory files in order to protect the privacy of those persons. In this case, however, Perot himself has made several public statements indicating that he has offered to aid the federal government in hostage rescue and drug interdiction operations. Redaction of Perot's name from any responsive documents in the TECS files that involve the subject matter of those disclosures, if those records are not otherwise exempt from disclosure under Exemption 7(C) or other exemptions set forth in § 552(b)(7), would not serve any useful purpose in protecting his privacy. Perot's decision to·bring information connecting himself with such efforts into the public domain differentiates his privacy interest from the interest of unnamed *Safe-Card* witnesses who did not voluntarily divulge their identities; these public disclosures effectively waive Perot's right to redaction of his name from documents on events that he has publicly discussed.[10] *Davis,* 968 F.2d at 1280.

In summary, we find that both grounds upon which the court granted summary judgment on the applicability of Exemption 7(C) were erroneous. We therefore reverse the grant of summary judgment on this issue, as well as on the issue of the adequacy of Customs' search. On remand, we instruct the district court to engage in an ad hoc balancing of the interests implicated by disclosure, in a manner which takes into account our characterization of appellants' request as relating to agency conduct, as well as Perot's activities as a private citizen.

*So ordered.*

---

**10.** Perot's voluntary decision to publicly disclose the fact that he has made some offers to aid in federal drug interdiction efforts distinguishes this case from other situations where the govern-

ment, rather than the individual, puts information in the public domain. *Cf. Reporters Committee,* 489 U.S. at 762–771, 109 S.Ct. at 1476–80; *Davis,* 968 F.2d at 1279–80.