Jack D. McNAMERA, Plaintiff

v.

UNITED STATES DEPARTMENT OF JUSTICE, Defendant

No. P–96–CA–050.

United States District Court,
W.D. Texas,
Pecos Division.

Aug. 12, 1997.

Jack D. McNamera, Alpine, TX, pro se.

Stephen G. Jurecky, U.S. Attys. Office, El Paso, TX, David O. Bucholz, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION
## AND ORDER

FURGESON, District Judge.

1) **DENYING DEFENDANT'S MOTION FOR RECONSIDERATION, FILED ON JANUARY 27,1997;**

2) GRANTING DEFENDANT'S MOTION TO SEAL, FILED ON FEBRUARY 5, 1997;

3) DENYING DEFENDANT'S MOTION FOR AN IN CAMERA REVIEW, FILED ON FEBRUARY 5,1997;

4) GRANTING DEFENDANT'S MOTION TO ACCEPT LATE FILING, FILED ON FEBRUARY 5,1997;

5) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, FILED ON APRIL 18, 1997;

6) DENYING PLAINTIFF'S MOTION TO UNSEAL GOVERNMENT RECORDS IN P–92–CR–03, FILED ON MAY 15,1997;

7) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, FILED ON MAY 15, 1997;

8) DENYING PLAINTIFF'S MOTION FOR DISCOVERY, FILED ON MAY 15, 1997;

9) GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN EXCESS OF 10 PAGE LIMIT, FILED ON MAY 15,1997.

## INTRODUCTION

Currently pending before the court are the parties' cross-motions for summary judgment. A hearing on the Motions was held in Pecos, Texas, on July 18, 1997. Both sides submitted excellent briefs and argued very ably before the court. After careful consideration of the facts in light of the relevant case law, the court is of the opinion that full summary judgment should be entered in favor of the Defendant.

Plaintiff submitted a Freedom of Information Act (FOIA) request to numerous component agencies of the Department of Justice. Not having received the type of response he sought, Plaintiff sued. After a hearing in November 1996, the court clearly defined the scope of Plaintiff's request and set forth all of the agencies which were to process it. Agencies to which Plaintiff's request had already been sent were asked to submit a *Vaughn* Index. A *Vaughn* Index is an intermediate step short of ordering full disclosure of the requested documents. It is meant to give

the court an overview of what documents are being withheld and an independent basis on which to decide whether the documents are being withheld properly. Over half of the federal agencies did not find anything responsive to Plaintiff's request. Most of the remaining agencies acknowledged the existence of records responsive to Plaintiff's request, but asserted an exemption against their disclosure. These agencies submitted a *Vaughn* Index in compliance with the court's previous Order. Two federal agencies, the FBI and INTERPOL, asserted the standard "Glomar response," refusing to either confirm or deny the existence of any records response to Plaintiff's request. The "Glomar response" is derived from a D.C. Court of Appeals case which approved a response to the effect that an agency could neither confirm nor deny the existence of records.

The outcome of this case is influenced by the court's determination that the Plaintiff's request fell outside the core purpose of FOIA. FOIA was meant to give citizens a window on the workings of their government. It was not intended to serve as a mechanism for obtaining private information about private individuals. In coming to its decision, the court carefully reviewed the submitted *Vaughn* Indexes. It found that the information contained therein was exempted from disclosure by FOIA. The court also found that both the FBI and INTERPOL properly asserted the "Glomar response." In a case such as this, where private information on a private individual is being requested, an agency need not confirm nor deny the existence of records response to a FOIA request if it set out, in affidavit form, detailed reasons for its actions. Since the end result of the court's opinion is that no records are being improperly withheld, the court finds that an entry of summary judgment for Defendant is proper.

## BACKGROUND

1) *United States v. Thompson and Chambers*

To men and women in law enforcement, it is a dark day when one of their own goes bad. Such was the case with long time Presidio County Sheriff Richard (Rick) Dee

Thompson. On the morning of December 4, 1991, after receiving a tip from an informant, law enforcement officials seized a horse trailer containing 2,421 pounds of cocaine, with an estimated street value of $1 billion. This was the biggest drug bust in West Texas history to date. The horse trailer, which was parked at the Presidio County Fairgrounds, belonged to the Presidio County Sheriff's Office. As soon as news of the seizure became public, the Sheriff of Presidio County, Sheriff Thompson, called a news conference, during which he announced that he himself had placed the drugs in the trailer in preparation for a reverse sting operation. What Thompson did not know was that he had been under surveillance by federal counter-narcotics agents for several months. Evidence had been collected on Thompson's involvement not only in that haul, but in several others in the preceding months. No one bought Thompson's reverse-sting operation story, and he was soon indicted by a federal grand jury for the Pecos Division on four drug related counts.

Indicted with Thompson as a co-conspirator was Robert Glynn Chambers, who had been suspected as a drug runner for a long time, first for the Acosta, and then for the Carillo–Fuentes, organizations. Although both men were indicted in the Pecos Division of the Western District of Texas, the case was soon transferred to Judge Buckmeyer's docket in Dallas. Judge Bunton, the presiding judge in the Pecos Division, recused himself because, at one time, he had represented Thompson in an election dispute.

Both men faced prison terms of 10 years to life on each count, and a fine of up to $4 million. Thompson initially pled "not guilty" to the charges against him. Chambers, however, agreed to plead guilty and to testify against Thompson. In return for his plea and testimony, the prosecutor agreed to recommend the minimum sentence and no fine. After re-evaluating his chances for success at trial, Thompson, too, decided to plead guilty. In return for his plea and promised cooperation, the prosecutor dropped three of the four charges against him and also recommended that he be given the minimum sentence and made to pay no fine.

Much of the story of what actually transpired soon came to light. Chambers, it turned out, had been working for the Carillo–Fuentes drug cartel for many years. Government records showed that he had smuggled 30 tons of cocaine and 20 tons of marijuana into the United States prior to his arrest in 1991. Thompson, on the other hand, had become involved in drug smuggling not too long before his arrest. He was a well-respected law enforcement official and had served as Sheriff of Presidio County for 19 years. The seized cocaine had been secreted across the border on the night of December 3, 1991. A DEA informant tipped off the authorities on the location of the trailer. Had the drugs been successfully moved into the United States, Chambers and Thompson would have stood to make $500,-000 each. The prosecutor recommended that both men receive the minimum 10–year sentence, but Judge Buchmeyer rejected those recommendations. Instead, he sentenced Chambers to 22–years and Thompson to life in prison. Both men were sentenced in the spring of 1992.

### 2) McNamera's FOIA Request

More than two years after these events transpired, Plaintiff, the publisher of the NIMBY News, submitted a Freedom of Information Act (FOIA) request, *see* 5 U.S.C. § 552, to the Department of Justice asking that the Department ask several of its component agencies to search their records for information on the "operation and prosecution of a narcotics conspiracy directed by Robert Glynn Chambers and Richard (Rick) Dee Thompson." McNamera's request stated that he was especially interested in information which disclosed "agency procedures and the working[s] of government." The component agencies whose records McNamera asked to be searched included the United States Marshals Service (USMS), Immigration and Naturalization Service (INS), Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), Executive Office of United States Attorneys (EOUSA) and "such other offices as maintain liaison with other law enforcement agencies and intelligence agencies." The end result of McNamera's request is well documented in this court's Memorandum Opinion and Order issued on December 6, 1996. *See McNa-*

*mara v. U.S. Dept. of Justice,* 949 F.Supp. 478 (W.D.Tex.1996) (sometimes referred to as *"McNamara I"*). Basically, with the exception of the INS, McNamera was notified by each component agency that no records responsive to his request would be forthcoming, either because he did not provide the agencies with a copy of a death certificate or a privacy waiver from either subject, or because one or more of the FOIA exemptions applied. The INS did not respond at all.

### 3) *McNamera I*

All appeals to the Office of Information and Privacy proved to be futile and McNamera filed suit in this court to compel agency compliance with FOIA. Both sides filed cross-motions for summary judgment: McNamera on grounds that the requested records were being improperly withheld; the Department of Justice on grounds that the court was without jurisdiction to consider Plaintiff's complaint because no records were being improperly withheld. A hearing on the cross-motions was held in Pecos, Texas, and the court issued its opinion on December 6, 1996. Because the question of subject matter jurisdiction had been raised, the court's primary task was to determine whether it had jurisdiction over Plaintiff's claims. In its December 6th Order, the court recognized that it had jurisdiction to consider Plaintiff's FOIA claims under 5 U.S.C. § 552(a)(4)(B) only if it found that agency records were being improperly withheld. Neither side contested the fact that, if any documents responsive to Plaintiff's request existed, they were agency records. Nor did the government argue that the records were not being withheld. Thus, the only issue before the court was whether the records were being withheld improperly. The court, however, could not make that determination from the record before it and dedicated the majority of its Order to detailing exactly what information it did need, and from whom, in order to have a sufficient factual basis from which to decide whether the withheld records fell within a claimed FOIA exemption. Specifically, the court ordered that the FBI, DEA, USMS and the EOUSA submit a *Vaughn* Index. The parameters of the Index were specifically set out in the court's Order:

The Index provided by each agency must adequately describe each record within its possession responsive to Plaintiff's request, state what exemption the agency claims and explain why the agency believes the record falls within the exemption. The agency does not have to describe a record to the extent that the description compromises its secrecy. A description is sufficient if it enables a court to reach its own conclusion as to what is in the record. Mere conclusory and generalized statements that a record falls within an exempt category, however, are insufficient. Finally, since an entire record is not exempt simply because a portion of it is, the *Vaughn* Index should make clear whether the government claims an exemption for the entire document or only a portion.

*McNamara,* 949 F.Supp. at 484 (internal citations omitted). All agencies, with the exception of the FBI, which asserted the "Glomar response," submitted either an Index or a detailed affidavit describing the contents of the withheld records and asserting various exemptions. As the court notes below, these submissions have given the court an adequate factual basis from which to determine whether the claimed exemptions were properly asserted.

In addition to ordering the above-four agencies to submit a *Vaughn* Index, the court ordered the Department of Justice to forward McNamera's request to the following component agencies: Office of the Attorney General, Office of the Deputy Attorney General, Office of the Associate Attorney General, Criminal Division of the Department of Justice, Office of Intelligence Policy and Review, INTERPOL, Office of Justice Programs and Office of Public Affairs. With the exception of INTERPOL, which, like the FBI, asserted the "Glomar response," a search by the other agencies failed to disclose the existence of any documents responsive to Plaintiff's request. As far as those agencies are concerned, then, there is little question that summary judgment should be entered in their favor. The court will address this point in more detail below.

In its December Order, the court also addressed the INS's non-response. According

to court records, INS had twice been notified of Plaintiff's request. Yet both times the request had been lost. The INS finally acknowledged its receipt in August 1996. A much belated search of its records failed to unearth any documents responsive to McNamera's request. What greatly troubled the court, however, was a purported policy of record destruction: certain records were being destroyed every three years. The court was of the opinion that if Plaintiff's request had been timely processed in October 1994, and not in August 1996, some records responsive to his request, which may have been destroyed in the interim, could have been found. In its December Order, the court ordered the INS to show cause under what authority it destroys records every three years and to explain how McNamera's FOIA request could have gotten lost or misplaced two different times. While the INS never adequately explained how McNamera's request got lost (it simply stated that when lots of mail gets processed certain pieces are bound to get lost), it is now clear to the court that if any records responsive to Plaintiff's request did exist, they did not get destroyed between the making of the request and its processing. What was not made clear to the court until recently was that only duplicates of records submitted by the field offices, which themselves retained the originals, are destroyed at INS Headquarters every three years. The original files maintained at the various field offices are retained for longer periods of time. Since Plaintiff's request was initially directed to INS Headquarters, failure to locate any documents responsive to his request did not mean that the documents were destroyed in the interim. In fact, a subsequent search of the Marfa and El Paso Border Patrol sectors uncovered about 300 pages of documents responsive to Plaintiff's request. Whether those documents should be disclosed is a different matter. The fact is, however, that the documents exist and were not destroyed.

The court's December Order ordered the FBI, DEA, USMS and the EOUSA to provide a *Vaughn* Index by January 31, 1997. It also ordered the other component agencies to process McNamera's request within 30 days of the entry of the Order. Finally, the INS was ordered to comply with the show cause order no later than January 17, 1997. All agencies complied with the court's Order. The DEA, for instance, filed a voluminous Index, going over each of the documents in its possession page by page and listing the claimed exemptions. Other agencies filed detailed affidavits. Before the court could revisit the question of jurisdiction, however, David O. Buchholz, an Attorney from the DoJ's Civil Division, made an entry of appearance in the case. After giving new counsel some time to familiarize himself with the case, the court ordered both sides to file cross motions for summary judgment. This feat was accomplished by May 1997, and a hearing on the Motions was held in Pecos, Texas, on July 18th.

The hearing focused on two issues: (1) the propriety of the FBI's and INTERPOL's "Glomar response" and (2) the applicability of the claimed exemptions asserted by the other agencies. As concerns the agencies that searched their records but did not find anything responsive to Plaintiff's request, the court is of the opinion that they are entitled to summary judgment. Plaintiff does not dispute that conclusion. He did not argue that those agencies were acting in bad faith when they conducted their search, or that they did not conduct a thorough enough search. Accordingly, the remainder of this discussion is limited to the two enumerated issues: the propriety of the "Glomar response" and the applicability of FOIA exemptions asserted by the various agencies.

## THE "GLOMAR RESPONSE"

In response to Plaintiff's FOIA request, both the FBI and INTERPOL asserted that they could "neither confirm nor deny" the existence of any documents responsive to Plaintiff request. The quoted language has colloquially become known as the "Glomar response," a name derived from a D.C. Circuit Court of Appeals case which sanctioned the use of this ambivalent response in the context of a FOIA request. *See Phillippi v. Central Intelligence Agency*, 546 F.2d 1009 (D.C.Cir.1976). Sometime in 1975, several newspaper articles profiled a covert CIA operation. The operation allegedly involved the use of a commercial vessel, the Hughes

Glomar Explorer, to recover a sunken Soviet submarine. The CIA apparently tried to contain the publication of any information related to this operation and contacted various news organizations with that in mind. Phillippi, a journalist, then filed a FOIA request with the CIA for all Agency records relating to the reported contacts with the media. The CIA denied Phillippi's request on grounds that, even if the types of documents she was requesting existed, they would be exempt from disclosure under FOIA exemptions (b)(1) and (3). The Agency's claim of exemption under (b)(3) was based entirely on 50 U.S.C. § 403(d)(3). That section provides, in relevant part, that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." In denying Phillippi's request, the CIA wrote "that, in the interest of national security, involvement by the United States government in the activities which are the subject matter of your request can neither be confirmed nor denied." *Id.* at 1012. Section (b)(1) exempts from disclosure material that is ordered classified by an Executive Order for purposes of national defense or foreign policy.

Phillippi sued in district court, asking the court to order the disclosure of any existing documents. The CIA submitted all material related to the case for *in camera* inspection, and provided two sealed affidavits in support of its position. The district court considered only the sealed affidavits and entered summary judgment in favor of the CIA. *Id.* at 1012. The basis for the court's ruling was that any documents that may exist could not be disclosed under 50 U.S.C. § 403(d)(3) and 403g and, as such, were exempt from disclosure under exemption (b)(3) to FOIA. Phillippi appealed. Her only argument on appeal, and the only issue considered by the D.C. Circuit panel, was whether the CIA should have been required to support its position on the basis of the public record. In a two-to-one decision, the court held that it should. Wrote the majority:

When an Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the

Agency's refusal. Therefore, to fulfill its congressionally imposed obligation to make a *de novo* determination of the propriety of a refusal to provide information in response to a FOIA request the District Court may have to examine classified affidavits *in camera* and without participation by plaintiff's counsel. Before adopting such a procedure, however, a District Court should attempt to create as complete a public record as is possible. *In camera* examination has the defect that it "is necessarily conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure."

*Id.* at 1013. The court then described the process of how a *Vaughn* Index should be compiled and submitted in a situation where a government agency is asserting an exemption under FOIA. The court recognized, however, that where the very disclosure that a record exists would itself be barred by an exemption, the traditional *Vaughn* Index would be inadequate to afford the protections of nondisclosure. In that instance, concluded the court, the Agency would be required

to provide a public affidavit explaining in as much detail as possible the basis for its claim that it can be required neither to confirm nor deny the existence of the requested records. The Agency's arguments should then be subject to testing by appellant, who should be allowed to seek appropriate discovery when necessary to clarify the Agency's position or to identify the procedures by which that position was established. Only after the issues have been identified by this process should the District Court, if necessary, consider arguments or information which the Agency is unable to make public.

*Id.* at 1013. In a footnote accompanying this passage, the Circuit Court observed that if the district court finds the agency's response unjustified, it could employ the standard *Vaughn* procedures in deciding whether any of the exemptions applied. *Id.* at 1013 n. 7.

Subsequent to *Phillippi*, the "Glomar response" has been most successfully asserted, and more universally sanctioned, in cases involving the CIA and FOIA exemption (b)(3). *See, e.g., Minier v. Central Intelli-*

gence Agency, 88 F.3d 796 (9th Cir.1996) (finding the "Glomar response" appropriate when the FOIA request concerned information on a possible CIA informant which was exempt from disclosure by 50 U.S.C. § 403g); *Hunt v. Central Intelligence Agency*, 981 F.2d 1116 (9th Cir.1992) (holding that the use of a detailed affidavit met the requirements of *Phillippi* ). Other agencies have not fared as well. *Nation Magazine, Washington Bureau v. United States*, 71 F.3d 885 (D.C.Cir. 1995) (rejecting the Customs Service's categorical assertion of the "Glomar response."); *see, e.g., Davin v. U.S. Dept. of Justice*, 60 F.3d 1043 (3rd Cir.1995) (rejecting a categorical "Glomar response" by the FBI). What separates the CIA from other agencies in the realm of FOIA disclosure is the Central Intelligence Agency Information Act, 50 U.S.C. § 431. The CIA Information Act provides a blanket exemption from FOIA requirements for most CIA operational files in order "to relieve the Central Intelligence Agency from an unproductive Freedom of Information Act (FOIA) requirement to search and review certain CIA operational files." *Hunt*, 981 F.2d at 1121 (citing U.S. Cong. & Admin. News 1984, 3742). No counterpart statute providing for such a broad exemption from disclosure exists for other agencies. More properly put, the court did not find a specific statute exempting disclosure under FOIA by any other agency, and no such statute was cited to this court.

Extrapolating from the D.C. Circuit Court's holding in *Phillippi*, and drawing heavily from the Supreme Court decision in *Department of Justice v. Reporters Committee*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), both the FBI and INTERPOL assert that the "Glomar response" is appropriate in the instant case because any documents that exist would be exempt from disclosure under exemptions (b)(7)(C) and/or (D). The agencies' argument is that when a document or a group of documents is categorically exempt from disclosure under FOIA, there is no need to balance the various interests involved. Rather, it is sufficient that the agency assert a "Glomar response" to meet its burden of persuasion under FOIA. As the following discussion shows, the agencies' interpretation of the law is correct.

*Department of Justice v. Reporters Committee* is the seminal Supreme Court case interpreting FOIA exemption (7)(C). That provision exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy...." *Reporters Committee* involved a FOIA request for criminal history records, commonly referred to as a rap-sheet, on an individual believed to have mafia connections, whose company had recently been awarded a Defense Department contract. First, the Supreme Court reaffirmed that the basic purpose of the Freedom of Information Act was "to open agency action to the light of public scrutiny." *Id.* at 772, 109 S.Ct. at 1481, 103 L.Ed.2d at 795 (quoting *Dept. of Air Force v. Rose*, 425 U.S. at 372, 96 S.Ct. at 1604, 48 L.Ed.2d at 11). The Court also stated that it was Congress's intent that FOIA contribute significantly to public understanding of the operations or activities of the government. *Id.* at 775, 109 S.Ct. at 1482–83, 103 L.Ed.2d at 797. There is a strong presumption of full agency disclosure unless the information sought is exempted under clearly delineated statutory language. *Id.* The nine exemptions listed in § 552(b) are exclusive and are to be narrowly construed by the courts. *See Department of Air Force v. Rose*, 425 U.S. 352, 366, 96 S.Ct. 1592, 1601–02, 48 L.Ed.2d 11 (1976).

The Court then considered the request before it and found that the information contained in "rap sheets" was exempt from disclosure under 7(C). Wrote the Court:

Official information that sheds light on an agency's performance of its statutory duties falls squarely within [the] statutory purpose [of FOIA]. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. In this case—and presumably in the typical case in which one private citizen is seeking information about another—the requester does not intend to discover anything about the conduct of the agency that has possession of the request-

ed records. Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

*Id.* at 773, 109 S.Ct. at 1481–82, 103 L.Ed.2d at 795–96. Where a government agency claims an exemption from disclosure, ordinarily a court must balance the public's interest in disclosure against the privacy interest of the individual or individuals named in the documents in avoiding disclosure. In certain cases, however, because the scales tip to one side all of the time, a categorical rule against disclosure may be adopted. Such was the case in *Reporters Committee.* The Court found that when a rap sheet is requested on a private individual, the privacy interest against disclosure will always outweigh the public interest in disclosure. Although the Court refers to this process as categorical balancing, there is little question that after the *Reporters Committee* decision, a district court need not undertake a balancing of interests where the FOIA request is for the law enforcement records or information solely concerning a private citizen. In *Reporters Committee,* the Supreme Court concluded:

> Accordingly, we hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is "unwarranted."

*Id.* at 780, 109 S.Ct. at 1485, 103 L.Ed.2d at 800. Rather, if a request falls within a certain class of information, it may simply be denied without the need for ad hoc balancing.

The holding of *Reporters Committee* governs the disposition of this case. Although the Supreme Court did not specifically address the propriety of the "Glomar response," and never made mention of *Phillippi,* the Court implicitly approved the use of the "Glomar response" where records would be categorically exempt from disclosure under FOIA. In *Reporters Committee,* the FBI had refused to either confirm or deny whether it had any information concerning nonfinancial crimes of the subject of the request. Because the court found that rap sheet information on a private individual fell within exemption 7(C) as a matter of law, the FBI need not have acknowledged the existence of any documents responsive to the request.

*Reporters Committee* does not abrogate the holding in *Phillippi* and subsequent cases applying *Phillippi.* The reader will recall that *Phillippi* required the agency asserting a "Glomar response" to provide a public affidavit explaining in as much detail as possible the basis for its claim that it can be required neither to confirm nor to deny the existence of the requested records. Because the "Glomar response" stems from an agency's assertion of a FOIA exemption, (b)(3) in *Phillippi* and (b)(7)(C) in *Reporters Committee,* for instance, the court has a statutory obligation under 5 U.S.C. § 552(a)(4)(B) to test the validity of this response. In other words, the court does not take on the role of a passive observer and accept as gospel an agency's assertion of an exemption. Rather, the court takes an active role in determining whether the claimed exemption, which is serving as the basis for the "Glomar response," applies. The threshold inquiry will vary from case to case, depending on the submitted request. In all cases where the "Glomar response" is asserted, however, the court must have before it a detailed affidavit setting forth the reasons why such a response is appropriate in the instant case.

▉ Where a FOIA request is analogous to the one made in *Reporters Committee,* where it is clear that the request will not contribute significantly to public understanding of the operations or activities of the government and seeks law enforcement information on private individuals, the court need not undertake a balancing test or order an *in camera* inspection before it decides that the documents are exempt from disclosure. Where the request, on its face, seeks information that goes to the core of FOIA, and the agency asserts a "Glomar response," the court must be much more diligent in deciding whether to undertake a deeper inquiry into the agency's claims. Even when an agency asserts a "Glomar response," the FOIA requester is free to argue to the court that the reasons underlying the "Glomar re-

sponse" are pretextual, otherwise incorrect, or unjustified. The government is likewise free to argue that the request does not go to the core purpose of FOIA. Where there are any doubts as to whether a claimed exemption applies, the court should not rely on the government's "Glomar response," but should order either an *in camera* inspection or a *Vaughn* Index. The latter is preferred over the former because it keeps in tact our system of adversarial dispute resolution. In other words, if the request is not clearly outside the bounds of FOIA, or the government's reasons for neither confirming nor denying that the information exists are suspect, the court must undertake the *ad hoc* balancing of interests in deciding whether an exemption applies.

It is important to emphasize that simply because a court rejects the government's use of the "Glomar response" does not mean that it finds a claimed exemption inapplicable. All it means is that the court must now balance the two interests at stake in determining the applicability of an exemption. It should also be noted that simply because a FOIA request mentions an individual or individuals does not mean that their interests in non-disclosure will always outweigh the public interest in disclosure. Depending on the request, the public's right to know may outweigh all privacy interests. *See, e.g., Nation Magazine,* 71 F.3d at 894–95. Conversely, simply because a request seemingly goes to the core of FOIA does not mean that the public interests in disclosure will always prevail. Where a court is called upon to balance the competing interest, it must do so conscientiously on a case by case basis.

The holding in *Ely v. FBI,* 781 F.2d 1487 (11th Cir.1986), cited to the court by McNamera, is not inconsistent with this analysis. In *Ely,* a federal prisoner filed a FOIA request with the FBI "for all files and information regarding Raymond J. Barry." The FBI responded that it could neither confirm nor deny the existence of files on Barry unless Ely filed an affidavit from Barry giving Ely access to the information. The FBI cited FOIA exemptions (b)(3), (6) and (7)(C) as justification. Ely sued in federal district court, which entered summary judgment in favor of the FBI. The Eleventh Circuit Court of Appeals reversed. Citing *Stephenson v.*

*Internal Revenue Service,* 629 F.2d 1140 (5th Cir.1980), the *Ely* court held that the district court's inquiry into the applicability of any of the asserted exemptions was inadequate as a matter of law. *Id.* at 1494. The district court required no *Vaughn* Index, no *in camera* inspection, no hearing, not even the filing of an affidavit to support the government's claim. *Id.* The effect, wrote the court, was to give the government an absolute, unchecked veto over what it would or would not divulge, in clear violation of the provision of the statute. *Id.* In *Stephenson,* the Fifth Circuit held that a district court must have an adequate factual basis for any decision it renders. *Stephenson,* 629 F.2d at 1144. In *Ely,* the court found that by simply relying on the government's claims of privilege, the district court did not have a sufficient factual basis on which to grant summary judgment for the government. What, at a minimum, must the district court have done? According to *Ely,* the district court should at least have requested a detailed affidavit from the FBI which set forth the reasons why a "neither confirm nor deny" response was appropriate in that case. *Id.* at 1493.

Contrary to Plaintiff's assertions, the *Ely* court did not reject the use of the "Glomar response." In fact, it adopted it wholeheartedly. Nor did the *Ely* court require the district court to undertake *in camera* review each time a "Glomar response" was asserted. What the Ely court did was remind the district courts that FOIA intended for them to have a very active role in construing the applicability of the claimed exemptions; and that when an agency asserts a "Glomar response," the court may not simply take the agency at its word, but has the obligation to determine independently the legitimacy of a claim of privilege based upon the government's proffer of evidence. *Id.* at 1491 n. 4. The court is in complete agreement with this rationale and finds that *Ely* fits neatly into the court's analytical framework.

Even the fairly recent D.C. Circuit Court of Appeals case, *Nation Magazine, Washington Bureau v. United States,* 71 F.3d 885 (D.C.Cir.1995), which rejected the Customs Service's categorical use of the "Glomar response," fits neatly into this court's analysis

of the law. In *Nation,* a FOIA request was made for all Customs Service records and documents indexed or cross-indexed under the name H. Ross Perot. The request also made clear that the requesters were "especially interested in documents and records that pertain to offers by Mr. Perot to assist the Customs Service in the interdiction of illegal drugs." *Id.* at 888. The Customs Service issued a "Glomar response," refusing to confirm or deny the existence of any such records. The Customs Service asserted that "disclosure of the mere fact that an individual is mentioned in an agency's law enforcement files carries a stigmatizing connotation." *Id.* The Nation sued in district court and both sides filed cross-motions for summary judgment. The district court granted summary judgment in favor of the Service and upheld its use of the "Glomar response." The D.C. Circuit Court of Appeals reversed.

In deciding whether a categorical "Glomar response" was appropriate, the D.C. Court first compared the two interests to determine "if the balance characteristically tips in one direction." *Id.* at 893. On the one hand, the Court found that while Perot did have some privacy interest in nondisclosure, the magnitude of that privacy interest was lessened because disclosure of any information would not result in unwarranted association with criminal activity or reputational harm. Any records that existed would show that Perot had offered to *help* the Customs Service. On the other hand, even though the documents would make mention of Perot, they would also shed light on agency action. The requesters had expressed interest in the "privatization of government functions," particularly operations which were covertly funded. Because the type of information that was requested was not categorically exempt from disclosure, as was the information requested in *Reporters Committee,* for instance, it was improper for the court to grant summary judgment on the basis of the government's "Glomar response."

The *Nation* court recognized that in some, perhaps many, instances where a third party asks if an agency has information regarding a named individual in its law enforcement files, the cognizable public interest in that information will be negligible; the requester will be seeking records about a private citi-

zen, not agency conduct. *Id.* at 895 (citations omitted). In some instances, however, where the requesters have identified a public interest cognizable under FOIA, a categorical rule exempting from disclosure law enforcement files containing the names of individuals cannot stand. In these cases, a more particularized approach is required. On remand, the D.C. Court ordered the district court to balance the two competing interests in order to determine whether any of the claimed exemptions applied.

■ This rationale falls squarely within the analytical framework outlined by the court *supra.* If, upon liberally construing the FOIA request, *see Nation,* 71 F.3d at 890, it is apparent to the court that the scales categorically tip in the direction of privacy, such as when a requester seeks the law enforcement record of a private individual, a court may base its decision solely upon a detailed affidavit asserting the "Glomar response." On the other hand, if the affidavit asserting the "Glomar response" is inadequate, i.e., if the affidavit does not set forth the reasons why the "Glomar response" is appropriate, or if the FOIA request seeks information that could shed light on agency action, the court has a duty to undertake a further inquiry and to balance the two competing interests. This may be accomplished by ordering the submission of a more detailed affidavit for *in camera* review, by ordering that the withheld documents be produced *in camera,* or by ordering the production of a *Vaughn* Index. As was earlier noted, simply because the court initially rejects the "Glomar response" does not mean that it finds the claimed exemption or exemptions inapplicable. Rather, by rejecting the initial response, the court is holding that it does not have an adequate factual basis on which to render its decision.

■ Applying this analytical framework to the case at hand, the court finds that the documents sought by McNamera from the FBI and INTERPOL are categorically exempt from disclosure and that both agencies have submitted affidavits sufficient to satisfy *Phillippi* and its progeny. McNamera's FOIA request reads, in relevant part, as follows:

I request documents concerning the operations and subsequent prosecution of a narcotics conspiracy directed by Robert Glynn Chambers of Presidio and Brewster counties; and former Presidio County Sheriff Richard (Rick) Dee Thompson between January 1986 and the present (which includes their arrest and conviction in 1992). I request a components search and emphasize that I am interested in what information might be held in senior agency offices, especially if it discloses agency procedures and the working of government.

While a request need not contain any "magic" words in order to fall within the purview of FOIA, the use of magic words alone will not survive the "Glomar response." In order for a request to go to the heart of FOIA, the documents requested must contain information that, if released, would contribute significantly to public understanding of the operations or activities of the government. Plaintiff's request for information on Thompson and Chambers is nothing more than a request for law enforcement files on private individuals. Simply because Plaintiff is interested in the "working[s] of government" does not mean that the records he seeks will shed any light whatsoever on whether a government agency is carrying out its statutory duties. A FOIA request must be specific enough for the agency to determine exactly what a requester is looking for. A requester cannot cast a fishing net in the hopes of ensnaring some information which may be releasable under FOIA. A request for documents that disclose "agency procedures and the working of government" is one such request. The types of documents sought by Plaintiff, documents that contain information on the operation and prosecution of the Thompson/Chambers conspiracy, have nothing to do with shedding light on "agency procedures and the working of government."

The type of information requested in this case is clearly analogous to the type of information requested in *Reporters Committee.* An acknowledgment that such information exists, or even the release of such information, will not show "what the government is up to." As both the FBI and INTERPOL noted in their respective affidavits, the very acknowledgment that records responsive to Plaintiff's request exist carries a stigma of being associated with a criminal investigation; and a private individual has a great privacy interest in not being so associated. While the court accepts the agencies' argument, it notes that the arguments holds true only so long as the government agency asserting the "Glomar response" has not publicly identified the individual as a subject of an investigation. Once an individual is so identified, no more stigma can attach from an admission by the same agency that it has documents responsive to a FOIA request. It must be remembered, of course, that neither the FBI nor INTERPOL were the investigating or prosecuting agencies in the Chambers/Thompson matter, so the two agencies never identified the two men as subjects of any investigations.

The process set forth in *Phillippi,* and applied by this court, worked exactly as intended. In their affidavits containing the "Glomar response," both agencies asserted substantially similar reasons for why such a response was appropriate. Basically, the agencies maintain that the public interest in disclosure is non-existent, or minimal at best, and, in any case, that it is outweighed by the privacy interest against disclosure. Accordingly, even if any records responsive to Plaintiff's request did exist, they would be exempt from disclosure. At the hearing on the cross-motions for summary judgment, Plaintiff was given the opportunity to argue that the reasons given in support of the "Glomar response" were pretextual or incorrect. McNamera first argued that the public has a great interest in learning about the turf wars that go on between the various federal agencies in West Texas and that disclosure of records on Chambers and Thompson will illumine that fact. As an example of this, McNamera notes that, while Chambers was being registered as an informant by one federal agency, he was under suspicion for drug smuggling by another. Although it may be of general interest to the public to know that there is discord between various federal agencies, the information Plaintiff has requested, about the criminal activities of two men, will not illumine that discord. Plaintiff next argued that Thompson's and Chambers' privacy interest in non-disclosure is not as great as the government has led the court to

believe. First, both men are convicted felons. And second, how can either man be any more stigmatized by a disclosure that they were the targets of a criminal investigation by two more federal agencies when it is a known fact that they were the subjects of a criminal investigation by other federal agencies?

First, although a convict does not enjoy the same rights enjoyed by individuals who have not run afoul of the law, the court was unable to find any case holding that a prisoner has fewer privacy rights in disclosure of private information, other than for information made public during the criminal proceedings, than the rest of us. The fact that Sheriff Thompson was at one point a public official does not diminish his privacy interest in not having information compiled in the course of a criminal investigation released. Simply because an individual was once a public official does not mean that he retains that status throughout his life. Thompson resigned his post; and once he did so, he became less of a public figure than before. By the time the FOIA requests were made, almost three years after the events in question had transpired, there is little question that Thompson was a private, not a public, figure. It is the individual's status at the time the request is made that is relevant to the court's inquiry.

Second, the court rejects the argument that an individual who has already been investigated by one federal agency cannot be stigmatized by an acknowledgment that he was investigated by another. The investigations by the various agencies may have been completely unrelated. Moreover, more of a stigma may be attached to an investigation by one federal agency than another. The stigma may also have to do with a perception involving the seriousness of the crime based on the number of agencies involved. Accordingly, because the court finds that the balance of interests categorically weighs in favor of exclusion, it finds that an entry of summary judgment in favor of the FBI and INTERPOL on the basis of their "Glomar responses" is appropriate.

The court notes that it is writing on somewhat of a clean slate, insofar as the Fifth Circuit has yet to expressly consider the viability of the "Glomar response." In one case, *Burge v. Eastburn,* 934 F.2d 577 (5th Cir.1991), the Court makes mention, in footnote 1, that the FBI refused to acknowledge in response to a FOIA request that certain individuals in fact gave statements at all. However, other than affirming that FOIA did not require the FBI to release the requested witness statements, the court did not pass on the propriety of the FBI's response. Until the Fifth Circuit has had a chance to speak directly on the issue, the court is guided by its own interpretation of other circuit precedent.

## APPLICABILITY OF THE CLAIMED EXEMPTIONS

Four component agencies of the Department of Justice, INS, USMS, DEA and EOUSA, submitted either a *Vaughn* Index or a detailed affidavit. All of the agencies asserted that the records in their possession were either (1) not responsive to Plaintiff's request or (2) were exempt from disclosure. The one exemption most often cited was 7(C). All of the agencies asserted that none of the records in their possession were reasonably segregable without the risk of disclosing exempted information. The discussion in the previous section concerning the definition and balancing of the public and private interests is equally applicable here. The court will address the propriety of the claimed exemptions of the various agencies after a brief summary of the law.

### 1) Summary of the law

FOIA Exemption 7(C) protects records of information compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). While much of the information at issue in this case was compiled in the course of a criminal investigation, the court notes that "records or information compiled for law enforcement purposes" are not limited to records or information compiled in the course of criminal investigations. *See Davin v. US. Dept. of Justice,* 60 F.3d 1043, 1054 n. 3 (3rd Cir.1995). While criminal investigation is certainly one law enforcement purpose, there are also additional law enforce-

ment purposes which are not necessarily criminal in nature. *Id.* In determining whether material falls within this provision, "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *Reporters Committee,* 489 U.S. at 776, 109 S.Ct. at 1483. Exemption 7(C) takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity. *Computer Professionals v. U.S. Secret Service,* 72 F.3d 897, 904 (D.C.Cir.1996) (citing *Dunkelberger v. Department of Justice,* 906 F.2d 779, 781 (D.C.Cir.1990)). That interest extends to persons who are not the subjects of the investigation but who may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation. *See Burge,* 934 F.2d at 579.

As was earlier noted, because the burden is on the government to show that a claimed exemption applies, the government must provide sufficient information to the court to aid the court in making its decision. While the usual method through which this is accomplished is either a *Vaughn* Index or an *in camera* review, neither one is required if the government agency provides a detailed enough affidavit to permit the court to independently determine whether a claimed exemption applies.

> The affidavits must show, with reasonable specificity, why the documents fall within the exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping. If the affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.

*Quinon v. FBI,* 86 F.3d 1222, 1227 (D.C.Cir. 1996) (quoting *Hayden v. National Security Agency/Central Security Service,* 608 F.2d 1381, 1387 (D.C.Cir.1979)). This view is echoed by the Eleventh Circuit. *See Miscavige v. IRS,* 2 F.3d 366 (11th Cir.1993). Whatev-

er method the court employs, it must simply be sure it has an adequate factual basis on which to base its decision. In this case, while all of the component agencies did not provide the exact type of Index envisioned by the court, they nonetheless provided sufficiently detailed affidavits to permit the court to independently decide that exemption 7(C) applies in all instances identified by the government.

The Supreme Court has stated that FOIA is focused "on the citizens' right to be informed about what their government is up to." *Reporters Committee,* 489 U.S. at 773, 109 S.Ct. at 1481. The public interest, then, is determined "by taking into account the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." *Computer Professionals,* 72 F.3d at 904 (quoting *Dunkelberger,* 906 F.2d at 781). If governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity and that the information sought is necessary in order to confirm or refute that evidence. *Id.* at 905 (citing *Davis v. Department of Justice,* 968 F.2d 1276, 1282 (D.C.Cir.1992)). A mere desire to review how an agency is doing its job, coupled with allegations that it is not, does not create a public interest sufficient to override the privacy interests protected by exemption 7(C). *Id.* (citing *McCutchen v. Department of Health & Human Services,* 30 F.3d 183, 188 (D.C.Cir.1994)).

Even if Plaintiff's request is given every benefit of the doubt, it is difficult, if not impossible, to see how his request relates to the basic purpose of FOIA. When it comes down to it, Plaintiff is simply requesting law enforcement records on two private individuals, compiled in the course of a law enforcement investigation. As the court earlier noted, simply because Plaintiff states that he is especially interested in the "working[s] of government" does not mean that his request goes to the core purpose of FOIA. The information contained in the requested documents

must be somehow related to the core purpose of FOIA. Information contained in investigative records compiled in the course of a criminal investigation reveals little, if anything, about the agencies' own conduct.

### 2) USMS

■ In response to the court's December Order, the USMS filed a Declaration of Florastine P. Graham, a FOIA officer with the USMS. The Graham Declaration states that the USMS found no records responsive to Plaintiff's request, *i.e.*, no records concerning the operation and prosecution of a conspiracy directed by Thompson and Chambers. After the court's December Order, an additional search was conducted within the USMS for all documents that simply mentioned Thompson and Chambers. All of the documents, a total of 93 pages, contain information pertaining to Thompson's and Chambers' personal and/or criminal history, arrests, dates of custody, places of detention and their production for judicial proceedings. The USMS did not take any part in the underlying criminal investigation of the two men. There is little question that some of the information contained in the records maintained by the USMS is highly sensitive. There is also little question that release of the information will not aid the public's understanding of what the government is up to. Accordingly, the court finds that not only were there no documents responsive to Plaintiff's request, but that all of the documents identified by the USMS are not being improperly withheld and are exempt from disclosure.

### 3) INS

■ As was earlier noted, Plaintiff's request had been sent to the INS a total of three times before it was finally processed in August 1996. See the discussion in *McNamara I*. In support of the DoJ's Motion for Summary Judgment, INS provided the Declaration of Ave M. Sloan, Chief of the INS FOIA section. In the Declaration, Sloan states that a search for responsive records within INS Headquarters in Washington, D.C., which includes the Office of Investigations, Border Patrol and Intelligence, did not turn up any records responsive to Plaintiff's request. However, the INS also conducted a search at the INS Border Patrol Sector

Headquarters in Marfa, Texas, and at the Border Patrol Special Coordinating Center in El Paso. The search revealed nothing at the Coordinating Center, but did reveal a file containing a total of 281 pages at the Marfa office.

Sloan reviewed the 281 pages and determined that 178 of them were beyond the scope of the FOIA request, in that they did not document activities related to the alleged narcotics conspiracy or predated the time frame of Plaintiff's request or both. The remaining 103 pages were processed as responsive documents. Of those, only 58 pages worth of documents were generated by the INS. The remaining 45 pages consisted of copies of DEA reports. They were returned to the DEA for a determination of releasability. The 58 pages of information consisted of Reports of Investigation, copes of internal correspondence and notes about the investigation, Intelligence Reports and an undercover operations request. According to the declaration, all of the documents contain information relating to alleged illegal activity of the targets of the investigation. They also include information provided by confidential informants, witness statements, investigators notes, personal information, and general information about the illegal activity being investigated. INS maintains that the documents are exempt from disclosure under (b)(7)(C). The court agrees. As the court previously determined, the public interest in disclosure is minimal, at best. The privacy interest in not having the information disclosed, however, is great. Because the scale tips in favor of nondisclosure, the court finds that the INS properly asserted exemption 7(C).

### 4) DEA

The DEA provided the most detailed *Vaughn* Index of all of the federal agencies. According to the Declaration of Leila I. Wassom, a Paralegal Specialist with the DEA's Freedom of Information Section, two files concerning Thompson and Chambers were found. The files consisted of a total of 470 pages. Portions of 14 pages were released to McNamera. The information contained in each of the remaining pages, and the specific

exemptions claimed as to each piece of information, was set out in the *Vaughn* Index. In all, the DEA asserts four different exemptions; one of which, exemption 7(C), has already been discussed at some length. Additionally, the DEA maintains that exemptions (b)(2), (b)(7)(D) and (7)(F) apply to exempt the remaining information from disclosure. Title 5, United States Code, section 552(b)(2) exempts from disclosure matters that are related solely to the internal personnel rules and practices of an agency. Exemptions 7(D) and (F) exempt from disclosure records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement information "... (D) could reasonably be expected to disclose the identity of a confidential source, ... or (F) could reasonably be expected to endanger the life or physical safety of any individual." The court has reviewed the entirety of the DEA Index and finds that all exemptions, except for exemption 7(F), whose proper use the court need not decide, were properly asserted.

 For instance, under exemption (b)(2), the DEA seeks to withhold disclosure of any internal tracking information. Most of the pages in the two files contain G–DEP (Geographic Drug Enforcement Program) Codes and NADDIS (Narcotics and Dangerous Drug Information System) numbers. G–DEP codes indicate the priority of DEA narcotics investigations, types of criminal activities involved, the suspected location of the activities and the classification of the suspected violators. NADDIS numbers are numbers assigned to drug violators and suspected drug violators known to the DEA. The release and decoding of this identifying information would not only be detrimental to the smooth running of the DEA, but could compromise ongoing criminal investigations.

 The DEA also maintains, and the court has independently determined, that multiple pages contain the names or identities of confidential informants and, as such, that information is exempt from disclosure under 7(D). The seminal Supreme Court case interpreting exemption 7(D) is *Department of Justice v. Landano*, 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Landano involved a FOIA request by a convicted felon for information on his victim, a slain

police officer, and on another individual. The FBI released several hundred pages of information. Several hundred additional pages, however, were not released on the basis of exemption 7(D). Landano sued and the case made its way to the Supreme Court. The Supreme Court ruled that

> the Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation.

508 U.S. at 181, 113 S.Ct. at 2024, 124 L.Ed.2d at 100. Nevertheless, the Court recognized that when

> certain circumstances characteristically support an inference of confidentiality, the Government ... should be able to claim ... Exemption 7(D) without detailing the circumstances surrounding a particular interview.

*Id.* at 177, 113 S.Ct. at 2022, 124 L.Ed.2d at 98. It was reasonable to infer, noted the Court, that paid informants normally expected their cooperation with the FBI to be kept confidential. *Id.* at 177–180, 113 S.Ct. at 2022–24, 124 L.Ed.2d at 98–99. The ultimate question for the courts in deciding whether exemption 7(D) applies is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential. *Id.* at 171–72, 113 S.Ct. at 2019–20, 124 L.Ed.2d at 94 (emphasis in original). The DEA declaration addressed the very question presented in *Landano*.

According to the DEA Declaration, one DEA source was interviewed several times, and the report of one interview states that the source was "assured ... that his or her cooperation would be kept confidential." Several other sources are simply referred to in the reports as confidential sources. Moreover, the situation presented here is of the kind envisioned by the Supreme Court in *Landano* when it held that certain circumstances characteristically support an inference of confidentiality, permitting the Government to claim exemption 7(D) without the need to detail the circumstances surrounding

a particular interview. With billions of dollars at stake, it is no secret that drug traffickers are not above using brutal violence to silence those who have turned against them. It goes without saying that an individual who informs on drug runners for the federal government has a tremendous expectation that his or her identity not be made public for fear of reprisal. Accordingly, the court concludes that the DEA properly asserted exemption 7(D). Those documents, or portions of those documents, designated as exempt from disclosure under 7(D) should not be disclosed.

■ Finally, as to the remainder of the documents, the DEA asserts that they are exempt under 7(C) and 7(F). Because the DEA has asserted exemption 7(F) in conjunction with exemption 7(C), and because the court finds that exemption 7(C) has been properly asserted, the court will not pass on the propriety of exemption 7(F). The court has thoroughly reviewed the *Vaughn* Index submitted by the DEA and finds that the disclosure of information contained in the various documents was compiled for law enforcement purposes and could reasonably be expected to constitute an unwarranted invasion of personal privacy. This intrusion is not outweighed by the public interest in disclosure. Accordingly, the court finds that all of the documents identified by the DEA in its *Vaughn* Index are exempt from disclosure.

### 5) EOUSA

■ Of the government agencies that submitted a *Vaughn* Index or a detailed affidavit, the EOUSA was the agency in possession of the most documents related to Plaintiff's request. In fact, a record search revealed a box containing 4,059 pages of documents pertaining to the prosecution and conviction of Chambers and Thompson. All of the documents located in response to Plaintiff's request were reviewed by Bonnie L. Gay, Acting Assistant Director of the EOUSA FOIA Section. Ms. Gay filed a detailed affidavit in support of Defendant's Motion for Summary Judgment, detailing her findings.

Of the 4,059 pages of documents, 634 pages consisted of public documents that had previously been offered to McNamera. These documents included news clips, press releases, court records, detention hearing transcripts and published court decisions. The remaining documents were divided into ten functional categories. Although the EOUSA asserted that all non-public documents were exempt from disclosure under exemption 7(C), the agency's analysis did not stop there. Gay identified eight different privacy interests encompassed by exemption 7(C), and asserted one or more of these specific interests for each of the functional categories. The asserted privacy interests, as listed by Gay, are: (1) connection with the criminal investigation of Thompson and Chambers; (2) financial matters, personal expenses, credit card charges, mortgage payments and credit history; (3) personal details, personal experiences with friends and colleagues; (4) medical records; (5) social security numbers; (6) criminal history, commonly referred to as "rap sheet;" (7) cooperating witnesses, potential witnesses, third parties and other individuals who provided information to law enforcement agencies; and (8) names of state and federal law enforcement personnel. These privacy interests were then correlated with a functional category, and were accompanied by a detailed explanation as to why that privacy interest should apply. For instance, for the category "Documents responsive to grand jury subpoenas; copies of third party checks, bank statements, phone bill statements, bills of repair and invoices, loan applications," which contained a total of 1,497 pages, the EOUSA asserted privacy interest number two. The explanation that followed made note that this was extremely personal information whose disclosure would expose a great deal about a person to the outside world. Furthermore, the court finds that the information contained in this category, and in the other categories, for that matter, is not the type of information whose disclosure FOIA envisioned. Disclosing someone's bank statements or phone bills tells the public nothing about the functions of the EOUSA. So as not to belabor the point, the court has carefully reviewed the remaining functional categories, the claimed privacy exemptions, and the accompanying explanations, and finds the exemptions to have been properly asserted. Accordingly, the court is of the opinion that the EOUSA did not improp-

erly withhold any information from McNamera.

## CONCLUSION

In light of this Opinion and Order, the court holds for the Defendant. Therefore,

It is ORDERED that Defendant's Motion for Summary Judgment, filed on April 18, 1997, be GRANTED, and

It is ORDERED that Plaintiff's Motion for Summary Judgment, filed on May 15, 1997, be DENIED.

Other Motions before the court are still pending and are now resolved as follows:

It is ORDERED that Defendant's Motion for Reconsideration, filed on January 27, 1997, be DENIED.

It is ORDERED that Defendant's Motion to Seal, filed on February 5, 1997, be GRANTED.

It is ORDERED that Defendant's Motion for an in Camera Review, filed on February 5, 1997, be DENIED.

It is ORDERED that Defendant's Motion to Accept Late Filing, filed on February 5, 1997, be GRANTED.

It is ORDERED that Plaintiff's Motion to Unseal Government Records in P–92–CR–03, filed on May 15, 1997, be DENIED.

It is ORDERED that Plaintiff's Motion for Discovery, filed on May 15, 1997, be DENIED.

It is ORDERED that Plaintiff's Motion for Leave to File Memorandum in Support of Motion for Summary Judgment in Excess of 10 Page Limit, filed on May 15, 1997, be GRANTED.